Warren H. WHEELER et al., and C. C.
Spaulding, III, et al., Appellants,

v.

The DURHAM CITY BOARD OF EDUCA-
TION, a body politic in Durham Coun-
ty, North Carolina, Appellee.

No. 9630.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 12, 1965.

Decided June 1, 1965.

James M. Nabrit, III, New York City,
(Jack Greenberg, Derrick A. Bell, Jr.,
New York City, Conrad O. Pearson, M.
Hugh Thompson, William A. Marsh, Jr.,
F. B. McKissick and J. H. Wheeler, Dur-
ham, N. C., on brief) for appellants.

Jerry L. Jarvis and Marshall T. Spears,
Durham, N. C. (Spears, Spears & Barnes,
and Watkins & Jarvis, Durham, N. C., on
brief) for appellee.

Before HAYNSWORTH, Chief Judge,
and SOBELOFF, BOREMAN, BRYAN
and J. SPENCER BELL, Circuit Judges,
sitting en banc.

BOREMAN, Circuit Judge.

For a third time these consolidated cas-
es involving desegregation of the public
schools of Durham, North Carolina, are
here on appeal. The actions were begun
in 1960. In July, 1961, the District
Court found [1] that the Durham City

1.  Wheeler v. Durham City Board of Education, 196 F.Supp. 71 (M.D.N.C.1961).

Board of Education (hereinafter "Board") operates a dual system of attendance areas based on race but refused to consider the case as a class action and entered no injunction, although directing the Board to reconsider the school placements of certain plaintiffs who were found to have exhausted all administrative remedies. Subsequently, in April, 1962, the District Court denied all relief and dismissed the case holding that the plaintiffs were not entitled to a general desegregation order for the school system.[2] Plaintiffs appealed and this court reversed.[3] This court condemned the continued use of dual attendance zones for initial assignments and the discriminatory procedures in connection with applications for transfer.

On remand, pursuant to this court's direction, the District Court entered an order on January 2, 1963, which required that the named plaintiffs be granted transfers as requested, enjoined certain discriminatory practices and provided that the order remain in effect until a satisfactory desegregation plan was presented and approved.

In April 1963, the Board proposed a desegregation plan to which the plaintiffs objected on numerous grounds. After a hearing, the lower court rejected the plan and ordered that the Board grant pupils free transfers, in September 1963, to desegregated schools upon request in grades one through nine. High school assignments remained as before during the 1963–64 term. The Board was directed to present a new plan for complete desegregation and the Board appealed but this court affirmed the District Court's order as "an appropriate interim decree."[4]

On or about April 28, 1964, the Board filed a new desegregation plan which contained lengthy and detailed provisions for pupil assignment. In summary, some of the basic features of the plan may be stated as follows:

(a) First grade pupils would be initially assigned in accord with an attendance area map adopted by the Board. By applying within fifteen days, these pupils might obtain transfers out of their attendance areas. Such transfers "shall be granted in the order received until the maximum capacity, per classroom shall be attained."

(b) Other elementary pupils would be assigned to the school they are now attending.

(c) Pupils assigned to elementary or junior high schools outside their attendance areas may request permission to attend the schools in their respective areas by applying for reassignment during a fifteen-day period. Requests shall be granted until capacity is reached.

(d) Pupils completing elementary school to be assigned to junior high school in accordance with a new attendance area map.

(e) Pupils completing junior high school to be assigned to high schools under a feeder system by which graduates of Brogden, Carr, and Holton will be assigned to Durham High School and graduates of Whitted and Shepard will be assigned to Hillside High School.

(f) Junior high school pupils would be assigned to the schools previously attended except that Whitted pupils living in the area of the new Shepard School would be assigned to Shepard.

(g) High school pupils are assigned to the school previously attended.

(h) Reassignment requests to be made within fifteen days after notification of initial assignment. Requests shall be granted in the order received and until class capacity is reached.

2. Wheeler v. Durham City Board of Education, 210 F.Supp. 839 (M.D.N.C.1962).

3. Wheeler v. Durham City Board of Education, 309 F.2d 630 (1962).

4. Wheeler v. Durham City Board of Education, 326 F.2d 759, 760.

Plaintiffs objected to the plan as inadequate and incomplete on several grounds among which were the following:

The attendance area maps for initial assignments in elementary and junior high schools were drawn on a racial basis and were designed to segregate the races in the schools.

The feeder system by which graduates of the all-Negro junior high schools are assigned to an all-Negro high school continues established segregation.

The District Court held a full evidentiary hearing on July 9, 1964. At the court's suggestion the parties filed proposed findings of fact and conclusions of law and presented oral arguments. On August 3, 1964, the court entered an order indicating disapproval of the Board's plan and stated, in part:

"1. That the plan for desegregating the Durham City Schools, including the amendment thereto, is disapproved for the reason that the court is of the opinion that the school zone boundaries, with respect to elementary and junior high schools, in some instances have been drawn along racial residential lines, rather than along natural boundaries or the perimeters of compact areas surrounding the particular schools.

"2. That the Durham City Board of Education has made substantial progress toward desegregating the Durham City School System which has resulted in the integration of the one formerly all-white high school, all three of the formerly all-white junior high schools, and nine of the eleven formerly all-white elementary schools. The plan submitted for the 1964–65 school year provides for a further desegregation of the school system by the rearrangement of school attendance zones.[5]

"3. That with respect to the 1964–65 school year, all pupils in the Durham City School System shall be initially assigned in accordance with the plan submitted by the defendant [Board] on April 28, 1964, which plan is incorporated herein and made a part hereof by reference. Any pupil that has not already been assigned under that plan shall be assigned, and notice of the assignment given to the pupil and his parents or guardian, within five days from the date of this order."

The order further provided that not later than August 10, 1964, the Board should publish a notice in the daily Durham newspapers notifying the parents or guardians of all assigned pupils that the pupils have the absolute right, *except as otherwise provided*, to attend, during the 1964–65 school year, a school of their choice in the city system which teaches the grades to which the pupils have been assigned.

Thus, all pupils are to be initially assigned in accordance with the Board's plan; they are to be notified of their free choice to attend any school in the system but in the event of overcrowding the Board, with the approval of the court, can assign a child to the "next nearest predominantly white school" rather than to the school requested. The order is to remain in effect unless and until some other plan is presented to and approved by the court. If no other plan is presented and approved by the end of the 1964–65 school term, or by the end of a subsequent term, initial assignments are to again be made in accordance with the Board's plan and pupils shall have the same transfer rights as provided in the order.

From the testimony and the exhibits, it clearly appears that, in June 1964, there were several schools in the city system which were overcrowded, with an enrollment considerably in excess of capacity, while others were not filled to capacity. For example, the all-Negro Whitted Junior High then had an enroll-

5. The court did not point out the proposed rearrangement of particular attendance zones which would result in further desegregation.

ment of more than 300 beyond its normal capacity of 1,320 although it was proposed to alleviate this condition to some extent by assigning to the new Shepard Junior High[6] those pupils residing in the Shepard attendance area who had been enrolled in Whitted for the 1963–64 school year. The formerly all-white Durham High School, with a normal capacity of approximately 1,775, had an excess enrollment of approximately 26 and out of the total enrollment, only about 22 were Negroes. The Board proposed in its submitted plan that graduates of predominantly white Brogden, Carr, and Holton Junior High Schools should be assigned to Durham High School. The all-Negro Hillside High School had an enrollment of approximately 47 in excess of its normal capacity of 1,350. The plan provided that graduates of the predominantly Negro Whitted and Shepard Junior High Schools would be assigned to Hillside High. By this system Negro pupils in Negro junior high schools would be fed into the Negro high school and the overwhelming majority of the three predominantly white junior high schools would be fed into the high school where all the pupils were white except the relatively few Negroes who had been transferred there since the commencement of litigation. The plan further proposed that initial assignments would be made according to attendance area maps. The court determined that some school zone boundaries for elementary and junior high schools had been gerrymandered, that is, "in some instances [the boundaries] have been drawn along racial residence lines, rather than along natural boundaries or the perimeters of compact areas surrounding the particular school."

At the time of the last hearing below in this case, the Durham Public School System had about 15,400 pupils, including approximately 7,000 Negroes. During the 1963–64 school year, there were 19 elementary schools of which eight were all-Negro, two were all-white, and nine were predominantly white. There were four junior high schools, three of which were predominantly white, with comparatively few Negro pupils, and one was the all-Negro Whitted School hereinbefore mentioned. What further progress toward integration may have occurred as a result of the court's order of August 3, 1964, and the use of the transfer privilege is not disclosed by the record.

In its order of August 3, 1964, the court continued in effect an injunction which had issued on January 2, 1963, against the Board's discriminatory practices.[7] In the face of this restraining order, the Board had formulated and submitted its plan to continue initial and subsequent assignments of pupils and the feeder system which had been used in the past to produce and foster the continuation of the proscribed segregation and racial dis-

6. To be opened in September, 1964.

7. "It is further Ordered that the defendants, their agents, servants and employees are restrained and enjoined from any and all acts that regulate or affect the assignment of pupils to any public schools under their supervision, management or control on the basis of race or color. The defendants are specifically restrained and enjoined from (a) using any method of determining the placement of pupils in schools on the basis of racial consideration when pupils first enter the school system, when pupils are promoted from elementary school to junior high school, or from junior high school to high school, or when pupils change their residence from one part of the area served by the school system to another part of the school system's area; (b) using any separate racial attendance area maps or zones or their equivalent in determining the placement of pupils in schools; (c) from requiring any applicants for transfers to submit to any futile, burdensome, or discriminatory administrative procedures in order to obtain such transfers, including (but not limited to) the use of any criteria or standards for determining such requests which are not generally and uniformly used in assigning all pupils, and the requirement of administrative hearings or other procedures not uniformly applied in assigning pupils; and (d) using any standards relating to residence, academic achievement, overcrowding or otherwise in determining such transfer requests which are not used in determining initial assignment of all pupils."

crimination in the public schools. Possibly the Board reasoned that, by incorporating the proposed right of transfer provisions into the plan, it could escape or sidestep the restraints imposed by the January 1963 order. The District Court found that the proposed school zone boundaries had, in part, been gerrymandered and were based upon racial considerations. The continuation of initial assignments, the pattern of assignments into junior high schools, and the feeder system into the high schools would clearly be in violation of the court's order.

The time for commencement of the 1964–65 term was fast approaching when the court entered its order of August 3, 1964; the court was obligated to act without undue delay. The plan submitted by the Board as to pupil assignments was constitutionally unacceptable and could not be approved, as the court recognized. It appears from colloquies between court and counsel that the court was undertaking to follow the pronouncements of this court in Jeffers v. Whitley, 309 F.2d 621 (4 Cir. 1962). While the Board's plan made provision for a transfer privilege and the pupil's right to attend a school of his choice, the court, in final disposition, enlarged to some extent upon the proposal. For these efforts, to adopt legally acceptable procedures with respect to the 1964–65 school year, the court is to be commended since the apparent objective was to further desegregation of the schools and to eliminate racial discrimination in their operation.

This is not to say, however, that the August 3, 1964, order should or will be accorded full approval. To permit the Board's plan to operate as the basic method of determining initial assignments from gerrymandered zones and to control subsequent assignments, a legally indefensible plan which violates the lower court's order of January 2, 1963, in material respects, is contrary to this court's pronouncements concerning a permissible plan which, in operation, would afford complete freedom of choice, entirely free of any imposed racial considerations. Channeling pupils into schools by a method involving discriminatory practices and then requiring them, or even permitting them, to extricate themselves from situations thus illegally created, will not be approved.

In Jeffers v. Whitley, supra, this court placed the stamp of approval upon the right of free choice of schools to be exercised by parents and pupils at the time of initial pupil assignment and at reasonable intervals thereafter. In the more recent decision in Bradley v. School Board of City of Richmond, Virginia, 345 F.2d 310, which was handed down on April 7, 1965, the majority of this court held:

"* * * A state or a school district offends no constitutional requirements when it grants to all students uniformly an unrestricted freedom of choice as to schools attended, so that each pupil, in effect, assigns himself to the school he wishes to attend."

In Bradley the School Board had discontinued the use of long established dual attendance maps and zones in determining pupil assignments on a racial basis and the use of a racial feeder system which had been earlier condemned.[8] Instead, the schools were being operated under a system whereby each student was accorded the truly unrestricted freedom to attend the school of his choice. There was no problem with respect to overcrowding beyond the capacity of any school. This system was approved as meeting constitutional requirements. However, as was pointed out in Bradley,

"* * * In this circuit, we do require the elimination of discrimination from initial assignments as a condition of approval of a free transfer plan."

■■ We do not think that any statements appearing in the decisions of this

---

8. See Bradley v. School Board of the City of Richmond, Virginia, 317 F.2d 429 (4 Cir. 1963).

court in the Jeffers and Bradley cases would provide a basis for continuing in effect beyond the 1964–65 school term the Board's plan of pupil assignment in the City of Durham, even as enlarged by the court as to the pupil's right to transfer to a school other than the one to which he is assigned. If the Board so desires, it may abandon its objectionable plan and substitute in lieu thereof the unrestricted freedom of choice system as the Richmond School Board has done; or the Board may submit to the court some other assignment plan free of objections as to constitutionality but the present plan should be completely discarded and abandoned as a basis for determining initial and subsequent pupil assignments. The order of January 2, 1963, enjoining the use of racially discriminatory practices and procedures was reaffirmed and continued in effect by the order of August 3, 1964. The error here occurred when the District Court permitted the Board's plan to control discriminatory initial and subsequent assignments beyond the termination of the 1964–65 term. A freedom of choice system, to warrant approval, must operate to *prevent* discrimination and not merely to *correct* conditions which have been deliberately created by unlawfully discriminatory procedures.

■ The plaintiffs complain that the court below erred in refusing to enjoin the Board's practice of assigning teachers and other school personnel on a racially segregated basis. It appears from the record that the court, while continuing its injunction against acts that regulate or affect the assignment of pupils, also required the school authorities to make a detailed study of the administrative and other problems involved with respect to the hiring and placement of teachers and other school personnel and to be prepared to express themselves fully concerning such problems at the end of the 1964–65 school year.

This same question as to the assignment of teachers on a racially segregated basis was raised and considered in Bradley v. School Board of Richmond, Vir-

ginia, supra. This court there held that the plaintiff pupils had "standing to raise such a question to the extent it involves an asserted denial of constitutionally protected rights of the pupils." This was simply an affirmation of this court's earlier holding in Griffin v. Board of Supervisors of Prince Edward County, Virginia, 339 F.2d 486, 493 (4 Cir. 1964). In Bradley, as in the case at bar, the plaintiffs had made no effort to develop a record upon which a finding of actual discrimination against pupils could be predicated and there had been no inquiry as to the possible relation, in fact or in law, of teacher assignments to discrimination against pupils, nor had there been any inquiry as to the impact of such an order as the plaintiffs sought upon the administration of the schools and upon the teachers and administrative personnel. The majority opinion in Bradley states:

"When there has been no inquiry into the matter, it cannot be said that the plaintiffs have discharged the burden they must shoulder of showing that such assignments effect a denial of their constitutional rights.

"Whether and when such an inquiry is to be had are matters with respect to which the District Court also has a large measure of discretion. * * *"

In the instant case, we find no abuse of the court's discretion in refusing the requested order. Obviously the question raised is still before the court for further relevant inquiry and consideration.

A bond issue has provided approximately $3,500,000 to be expended by the Board for construction of new school buildings on sites to be acquired and for the enlargement, repair, and renovation of existing facilities. The plaintiffs complain that the court denied their request for a specific injunction against the use of these funds in the construction and reconstruction program to perpetuate, maintain, or support segregation. Plaintiffs appear to argue that the court found that this matter of construction was not pertinent to the litigation.

■ From remarks of the trial judge appearing in the record, we think he was fully aware of the possibility that a school construction program might be so directed as to perpetuate segregation. At the same time, he was reluctant to enter an order determining the location and size of new school facilities or what existing facilities should be enlarged. He clearly indicated his cognizance of the multitude of factors involved, such as the availability and cost of sites, the concentration of population, the present overcrowded conditions, etc. However, he was not unmindful of the responsibility of the Board in this area and he made known his conclusion that the burden would be on the Board to reasonably justify its actions and to demonstrate its good faith. Without specific or binding direction, the court expressed the hope that there would be some consultation between the parties to the litigation concerning the expansion program. The order last entered stated that the court had the assurance of the Board that its construction program would not be designed to perpetuate, maintain, or support segregation. It has been held that a school construction program is an appropriate matter for court consideration.[9] Conceivably the determination of the extent to which a busy court might or should undertake to formulate, direct, supervise, or police such a program would pose many problems. In view of the numerous factors involved in determining what, how, where and when new facilities are to be constructed or what old facilities may best be enlarged and renovated to meet pressing needs, the court's reluctance to issue a specific injunction is understandable, particularly since the Board was still subject to the provisions of the order of January 2, 1963, by which *any* and *all* acts that regulate or affect the assignment of pupils *on the basis of race or color* were enjoined.

We are advised that, as evidence of the Board's good faith, it held a special meeting in November, 1964, for the purpose of discussing capital needs, the use of the funds to be realized from the bond issue, and to consider its immediate and long-range programs for school location and construction. Plaintiffs' attorneys were invited to attend this meeting for the purpose of assisting the Board in its decisions and counsel for all parties met with the Board. Counsel for plaintiffs assured the Board that they would formulate their suggestions in the near future and present them before further action should become necessary with respect to these matters. Obviously the suggestion of the court as to consultation bore fruit, at least to that extent. As to what may have transpired since this appeal was submitted for decision, we have no knowledge.

■ Since this case must be remanded for further proceedings, a proper inquiry should be made as to the progress of the building and renovation program. The court, in its discretion and in view of the history of this litigation, may require the Board to disclose in detail to the court and plaintiffs' counsel its tentative plans as they develop so that, if any issue develops, the court may resolve it before the Board has committed itself to a course of action by contract or otherwise from which it cannot withdraw without difficulty.

It will be distinctly understood that nothing we have said herein shall be construed or interpreted as expressing disapproval of neighborhood schools designed to serve a geographical area, so long as such schools are not used to create or foster racial discrimination and segregation. We are informed that there are no public transportation facilities in Durham and the Board furnishes no means of pupil transportation. The school children must walk or be driven to and from school by their parents. This is an added factor to be considered in selecting sites for new buildings and in enlarging old buildings which are overcrowded. In a recent decision, in Gilliam v. School Board

9. See Board of Public Instruction of Duval County, Fla. v. Braxton, 326 F.2d 616 (5 Cir. 1964).

of the City of Hopewell, Virginia, 345 F.2d 325, (4 Cir. April 7, 1965), this court said:

"The Constitution does not require the abandonment of neighborhood schools and the transportation of pupils from one area to another solely for the purpose of mixing the races in the schools."

There it was found, however, that the area attendance zones were not gerrymandered or designed to impose a segregated school population. Certainly the Board here is under no obligation or requirement to abandon or discontinue the use of present school facilities. However, the potential effect of the proposed construction of new schools and the related program is a matter of concern and the District Court should take such action as, in its judgment, may be necessary to assure timely access to the courts.

The case will be remanded for further proceedings consistent with the views herein expressed.

Remanded for further proceedings.