Warren H. WHEELER, a Minor, by J. H. Wheeler, his father and next friend, et al., Plaintiffs,

v.

DURHAM CITY BOARD OF EDUCATION, etc., Defendant.

C. C. SPAULDING, III, a Minor, by C. C. Spaulding, Jr., his father and next friend, et al., Plaintiffs,

v.

DURHAM CITY BOARD OF EDUCATION, etc., Defendant.

Nos. C-54-D-60, C-116-D-60.

United States District Court M. D. North Carolina, Durham Division.

Jan. 19, 1966.

24. Compare Chesonis v. Celebrezze, supra note 12, and accompanying text, with Celebrezze v. O'Brient, supra note 23.

25. 323 F.2d 373, 378 (C.A. 3, 1963).

26. 315 F.2d 704 (C.A. 3, 1963).

27. Bujnovsky v. Celebrezze, 343 F.2d 868, 872 (C.A. 3, 1965).

———◆———

Jack Greenberg, James M. Nabrit, III, and Derrick A. Bell, Jr., New York City, and Conrad O. Pearson, M. Hugh Thompson, William A. Marsh, Jr., F. B. McKissick, and J. H. Wheeler, Durham, N. C., for plaintiffs.

Spears, Spears & Barnes, and Watkins & Jarvis, Durham, N. C., for defendant.

EDWIN M. STANLEY, Chief Judge.

This is another chapter in these consolidated cases involving the desegregation of the public schools of Durham, North Carolina. The actions were commenced in 1960. Formal opinions have been rendered by this Court on two previous occasions,[1] and the cases have been reviewed three times by the Court of Appeals for the Fourth Circuit.[2]

Following the last remand by the Court of Appeals,[3] counsel for the parties, on July 16, 1965, presented to the Court a consent order 'governing the assignment and reassignment of pupils in the Durham School System for the 1965–1966 school year.

At a conference with counsel on July 22, 1965, schedules were fixed for the parties to further express themselves with respect to (1) a constitutionally acceptable plan governing the enrollment and assignment of pupils for the 1966–1967 and subsequent school years, (2) the elimination of discrimination in the employment and assignment of teachers and administrative personnel, and (3) the renovation, enlargement or construction of school facilities designed to perpetuate, maintain, or support segregation. All unresolved issues were scheduled for trial on September 23, 1965.

At the opening of the trial on September 23, 1965, the Court was advised that the defendant on September 13, 1965, had filed a detailed report with respect to its contemplated capital improvement program for the year ending June 30, 1966, including its reasons for the enlargement of particular schools, the selection of new school sites and the construction of new school buildings. The plan set out in detail the current status of all buildings previously authorized by the defendant Board and also reviewed its long-range planning. Counsel for the plaintiffs stated that they had received a copy of the report, and that they did not desire to file objections or exceptions thereto. The right was reserved, however, to later object to the construction or enlargement of facilities not referred to in the report. Without objection, the Court, on September 28, 1965, entered a memorandum and

1. Wheeler v. Durham City Board of Education, 196 F.Supp. 71 (M.D.N.C., 1961); Wheeler v. Durham City Board of Education, 210 F.Supp. 839 (M.D.N.C., 1962).

2. Wheeler v. Durham City Board of Education, 4 Cir., 309 F.2d 630 (1962);

Wheeler v. Durham City Board of Education, 4 Cir., 326 F.2d 759 (1964); Wheeler v. Durham City Board of Education, 4 Cir., 346 F.2d 768 (1965).

3. Wheeler v. Durham City Board of Education, 4 Cir., 346 F.2d 768 (1965).

order authorizing the defendant Board to proceed with the acquisition of school sites, the construction of new buildings, and the enlargement or renovation of existing school buildings and facilities, in accordance with its report dated August 20, 1965, and received in evidence as Defendant's Exhibit No. 65–1. The order was without prejudice to the rights of the plaintiffs to thereafter file specific written objections to the acquisition of other school sites, or the construction of new buildings, or the enlargement or renovation of existing school buildings not set out and referred to in said report. The said report of August 20, 1965, and the Court's memorandum and order of September 28, 1965, are incorporated herein by reference.

With respect to the enrollment and assignment of pupils, the defendant Board, on September 23, 1965, was directed, not later than October 15, 1965, to file with the Court, with a copy to counsel for the plaintiffs, its plan for the enrollment and assignment of pupils for the 1966–1967 and subsequent school years. The Court expressed the opinion that the defendant was privileged to submit a plan based on either freedom of choice, as approved by the Court of Appeals in Bradley v. School Board of City of Richmond, Virginia, 4 Cir., 345 F.2d 310 ((1965), and Wheeler v. Durham City Board of Education, 4 Cir., 346 F.2d 768 (1965), or the compact school zone plan as referred to in Gilliam v. School Board of City of Hopewell, Virginia, 4 Cir., 345 F.2d 325 (1965). On October 25, 1965, the defendant filed a comprehensive plan governing the assignment and enrollment of pupils in the Durham School System during the 1966–1967 and subsequent school years, and indicated that a copy of same had been mailed to counsel for the plaintiffs on October 14, 1965. On October 25, 1965, the plaintiffs filed their response to said plan, advising the Court that, insofar as they were aware, the plan was consistent with the freedom of choice plan referred to by the Court of Appeals in Bradley v. School Board of City of Richmond, Virginia, 4 Cir., 345 F.2d 310 (1965).

The plaintiffs did not, however, consent to, or acquiesce in, an order approving the plan for the reasons that the issue of faculty segregation was vitally related to the adequacy of the plan. It was further contended that, in the context of these cases, the freedom of choice type of plan was inadequate to effect desegregation of the school system in view of the policy of the defendant in placing teachers in schools on the basis of race. In plaintiffs' supplemental response to said plan, filed on November 25, 1965, the Court was requested to reserve decision on the plan for the enrollment and assignment of pupils "until the issues relating to the defendant's practice of allocating teachers to schools on a racial basis [had] been resolved." Plaintiffs asserted that their request found direct support in Bradley v. School Board of the City of Richmond, Virginia, 86 S.Ct. 224 (November 16, 1965). The plan for permanent desegregation of the Durham City Schools, as filed with the Court by the defendant on October 25, 1965, and the responses of the plaintiffs filed on October 25, 1965, and November 26, 1965, are incorporated herein by reference.

On September 20, 1965, the North Carolina Teachers Association filed a written motion for an order to intervene as a party plaintiff in these cases, and to file a complaint in intervention. The certificate of service indicates that copies of the motion papers had been served on counsel for the defendant by mail on September 17, 1965. The applicant for intervention alleged that it was a professional teachers association and that most of its membership was composed of Negro teachers teaching in the public schools of North Carolina, including the Durham City Schools. It was contended that the intervention should be permitted on the grounds that (1) the applicant and its members were members of the class who would or might be affected by the relief prayed for by the original plaintiffs, (2) the applicant and its members had a substantial interest in the subject matter of the action, (3) the applicant and its members might be bound by any judgment

relating to the desegregation of pupils and teachers, (4) the claims of the applicant and those of the original plaintiffs presented common questions of law and fact, and (5) the intervention would not to any extent delay or prejudice the adjudication of the rights of the original parties who were represented by the same counsel. The applicant for intervention was represented by the same counsel as the original plaintiffs. Consequently, the applicant and its attorneys had known since the litigation was first started back in 1960 that the question relating to the employment and assignment of teachers in the Durham City Schools was one of the issues being litigated in this case, and had known since July 22, 1965, that this issue was one of the issues set for trial on September 23, 1965. Under Local Rule 21(g), the defendant had 20 days after service of the motion to file its response. If the complaint in intervention had been allowed and the defendant given time to file its answer, the evidentiary hearing scheduled for September 23, 1965, would have been delayed. Counsel for the plaintiffs stated that in no event did they want to delay the hearing. The Court denied the motion to intervene, and on September 28, 1965, filed a memorandum and order, incorporated herein by reference, setting forth its reasons for the action taken.

Commencing on September 23, 1965, a full evidentiary hearing was held on the one remaining issue, namely, the relation between employment and assignment of teachers and other school personnel on a racially segregated basis and the adequacy of the plan for the enrollment and assignment of pupils. At the conclusion of the hearing, the parties were given specified times within which to file proposed findings of fact, conclusions of law, and briefs. Oral arguments were waived. Since the plaintiffs offered no evidence, and requested no findings or conclusions, with respect to the employment and assignment of administrative personnel in the Durham School System, it is assumed that this issue has been abandoned.

The request for findings of fact, conclusions of law, and briefs of the parties having been received, the Court, after considering the evidence, including exhibits, answers to interrogatories and depositions, and briefs filed by the parties, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated:

## FINDINGS OF FACT

1. During the present school year, the Durham City Public School System is composed of two high schools, five junior high schools, and eighteen elementary schools. As of June, 1965, the System employed 652 teachers, 348 white and 304 Negro, and enrolled 14,365 pupils, 7,114 white and 7,251 Negro. By racial composition of students, one of the high schools is predominantly white and the other is attended solely by Negroes; three of the junior high schools are predominantly white, and the other two are attended solely by Negroes; and one of the elementary schools is all-white, nine are predominantly white, and the remaining eight are attended solely by Negroes.

2. In June of 1965, there were 408 Negro pupils attending thirteen schools with white pupils and white faculties. The balance of the Negro pupils attended schools with all-Negro faculties and pupils. All white children attended predominantly white schools with all-white faculties. No white child attended any of the eleven all-Negro schools.

3. In September of 1965, 600 Negroes attended school with white pupils and white faculties, 324 of them being in predominantly white schools for the first time. All white children in the System attended predominantly white schools with all-white faculties. The balance of the Negro students attended the eleven all-Negro schools. In September of 1965, one white teacher was employed by the all-Negro Hillside High School to teach English to outstanding students, and all other teachers in the eleven Negro schools were Negroes.

4. The Southern Association of Colleges and Schools, an accrediting agency, has recently approved for accreditation all of the elementary and high schools in the Durham City School System. Accreditation was also recommended for all junior high schools, except one attended solely by Negro pupils which was not found to be eligible because it had not been in operation one full year, and another attended predominantly by white pupils which had accreditation deferred pending the removal of certain deficiencies. During its survey, the Association did not report any instance where pupils in any school did not have the same level of instruction, or rapport between teacher and pupil, as found in all other schools in the System.

5. In recent years, the Durham City School System has employed between 75 and 100 new teachers each year as replacements and to fill new positions. Ordinarily, there are between 500 and 1000 applicants to fill these vacancies. Even with this large number of applicants, made up in part by wives of graduate students at Duke University, considerable difficulty has often been experienced in finding teachers in certain fields. The turnover among white teachers has been greater than among Negro teachers, resulting in a larger percentage of Negro teachers in the System having more years of experience than white teachers. Approximately 48% of the Negro teachers have graduate degrees, while only from 18 to 20% of the white teachers have graduate degrees.

6. The Durham City School System has a uniform salary scale for all teachers, both white and Negro, and salaries are based upon years of experience and degrees held. All public school teachers in the State of North Carolina, including the Durham City Schools, are employed on a year-to-year basis, and do not have tenure. There are no laws or regulations, State or local, governing the assignment of teaching personnel to particular schools. Teachers previously employed are required to make application each spring for re-employment, using a simplified application form. In addition to the employment of teachers before the commencement of the school year, a number of new teachers are employed to fill vacancies which occur during the year. For example, during the last six years, there have been from eleven to twenty vacancies during each school year.

7. During the 1963–1964 school year, eighteen new teaching positions were filled by four white teachers and fourteen Negro teachers. In 1965–1966, four new positions were filled by three white teachers and one Negro teacher.

8. As earlier noted, white teachers have been employed to teach in schools attended predominantly by white pupils, except for one white teacher who is employed at the all-Negro high school. Additionally, during the 1965 summer school program, a Negro teacher taught at a predominantly white elementary school, and a white teacher taught at an all-Negro elementary school. Integration of professional employees and activities in the Durham City School System has been achieved in the area of (1) meetings of supervisors, principals and teachers, (2) workshops and in-service training course, (3) grade level meetings, and (4) supervisory staff work.

9. Since 1959, no teacher in the Durham City Schools has been discharged or demoted by reason of decrease in enrollment of pupils at a particular school, or the practices of the defendant Board in making teacher assignments.

10. There is no evidence to support a finding, and indeed the plaintiff does not contend, that the defendant Board has not assigned equally qualified teachers to all schools, or that the quality of instruction at schools employing Negro teachers is not equal to the quality of instruction at schools employing white teachers.

11. There is no written policy requiring the assignment of teachers on a racial basis, but the practice and custom is admittedly maintained with the approval of the defendant Board.

12. Practice teaching programs have also been operated on a segregated basis.

This results in students from white colleges going to white public schools, and those from Negro colleges going to Negro public schools, for their student training. A white college student who sought assignment to a Negro school, and a Negro college student who sought assignment to a white school, were both denied such assignments. The superintendent maintains, however, that these applications were handled by the applicants in an unorthodox manner.

13. The defendant Board recruits teaching personnel by sending brochures containing general announcements of vacancies to both white and Negro training institutions in the southeastern part of the United States. Newspaper advertising is also employed at times to recruit personnel. The brochures emphasize the advantages of teaching in the City of Durham and in the Durham City School System. All interested persons are furnished with applications, which they are required to complete and return to the superintendent. New teachers are selected from such applications on basis of certification, experience, scholastic record, recommendations, appearance, personality, general attitude, and apparent fitness for a given vacancy. Before employing a teacher for any position, the applicants are personally interviewed in order to determine the quality of voice, and to discover the oral use of English and other traits not apparent from the written application. The application form requires that the applicant state his or her race, and submit a photograph.

14. In order to receive certification by the State of North Carolina, all new teachers are required to take the National Teacher Examination and receive a minimum score of 450 on the examination. Since April 3, 1964, the defendant Board has required all applicants to take the National Teacher Examination. During the last two years, all teachers who have been employed by the defendant Board have been required to have a score of 500, or better, on the examination.

15. While the defendant Board has no policy requiring the employment of Negro teachers to teach at all Negro schools, or the employment of white teachers to teach at all white or predominantly white schools, the admitted practice of the Board has been to employ the best qualified available Negro teachers for schools attended by Negro pupils, and the best qualified white teachers for schools attended solely or predominantly by white pupils.

16. On August 30, 1965, by a 4–2 vote, the defendant Board voted to continue its existing policy with respect to teacher assignments, but stated that it might, by majority vote, "make exceptions to any of its policies for valid and sound educational reasons." The superintendent understands this policy to mean that he has no authority to assign a white teacher to a Negro school, or a Negro teacher to a white school, without first submitting the matter to the defendant Board to determine if it will make an exception to the general policy. The majority report indicated that a considerable number of white parents had expressed "their dislike of having their children under Negro teachers"; that during the two years of free transfers, no white parent had requested transfer to a Negro school; that those white pupils assigned to a Negro school had in every instance requested reassignment to predominantly white schools; and that some Negroes had sought transfer from white schools to Negro schools. Because of the fact that in 1964–1965, under a free transfer plan, all white pupils attended predominantly white schools, and 94% of the Negro pupils attended all-Negro schools, the majority felt that substantial strength was given to their present policy of teacher assignments. The majority also believed that its questionnaire of teacher preferences correlated with pupil preferences, and that its policy of teacher assignments had provided the school system with the most effective program of education for all pupils. Dr. Speigner, a Negro member of the defendant Board, submitted a separate statement disagreeing with the decision to retain the racial policy in making faculty placements.

17. A committee of the defendant Board appointed to study the employment and assignment of teachers made a survey of the preferences of teachers employed in the Durham City Schools, and of their attitudes toward faculty integration. The results were tabulated from questionnaires sent to all teachers in the system. A return of the questionnaire was not required, and teachers who did return the completed forms were permitted to sign them, or not sign them, at their election. The questionnaire was returned by 93.7 per cent of the teachers. Of the 228 Negro teachers who returned the form, not a single teacher indicated that he or she felt better qualified to teach predominantly white classes, and only one indicated a preference to teach predominantly white classes. Of the 323 white teachers who completed and returned the questionnaire, the great majority indicated they felt best qualified to teach, and were most willing to teach, predominantly white classes. The white teachers indicated that they were least qualified, and least willing, to teach predominantly Negro classes.

18. The plaintiffs offered the testimony of several witnesses in the fields of sociology and education in an attempt to show the extent parental choices were influenced by faculty segregation where students were given complete freedom to attend schools of their choice. While none of these witnesses were found, or declared to be, experts in their respective fields, they nevertheless were permitted to express views with respect to the consequences of faculty segregation in a system where children were free to choose the schools they desired to attend.

19. The first witness offered by the plaintiffs was Myrl G. Herman, Professor of Education and Director of Laboratory Experiences at Rhode Island College, who testified that while he had made no study of the Durham City School System, and had no opinion concerning the adequacy of the free-enrollment policy presently in effect, he felt that schools should always employ and assign the best available teachers without regard to race. He further stated, however, that school boards should only assign teachers to schools where they were willing to teach, since a serious morale problem would arise if teachers were assigned against their wills. In the employment of teachers, Mr. Herman felt that the school board should be able to consider such factors as standing in college, experience, proficiency, personality, and ability to express themselves and to mingle with others. He stated that his experience taught that it was always desirable for school children to come in contact with all other cultures since they would be required to mix with other cultures after they had completed their education. Generally, he felt there was a reluctance on the part of parents to request an assignment of their children to schools which were totally or predominantly of another race, and that this was true of both white and Negro parents. He approves of the National Teacher Examination to the extent that school boards require all applicants for teaching positions to make a minimum score before their applications are considered.

19. Dr. Joseph S. Himes, Chairman of the Department of Sociology at North Carolina College, testified that a mixture of teachers by races had an advantage to pupils and teachers alike; that Negro teachers at an integrated school had an important morale value in that it gave them a sense of belonging; that segregated faculties had a tendency to create the impression that Negroes are inferior, and tended to demonstrate to Negro students that it was not possible to work with whites; that one of the consequences of faculty segregation was to encourage both Negro and white parents to continue sending their children to a school where teachers were of their same racial group; that he was against freedom of choice for students; and felt that schools should be forced to integrate. Dr. Himes stated, however, that he was not sure that his ideas had any validity in the Durham City School System since he was not familiar with the freedom of choice

method employed to assign students, or the effect such methods had on the employment and assignment of teachers.

20. Dr. Joseph P. McKelpin, Professor of Education at North Carolina College, stated that school children needed experience with all color groups in the community for the reason that such experience would cause some children to develop a better concept of themselves, and their efforts toward their goals and aspirations would be more realistic. Dr. McKelpin expressed the opinion that freedom of choice for students would not be meaningful without faculty desegregation for the reason that freedom to choose a school was an empty gesture as long as teachers remained segregated.

21. Howard M. Fritts, Jr., a teacher of Health and Hygiene at North Carolina College, and a member of the Durham Committee on Negro Affairs, testified that he has a child attending the fifth grade at Morehead Elementary School, a predominantly white school in the Durham City School System; that the primary objective of the Durham Committee on Negro Affairs was to improve educational opportunities for Negro youths, and that one of its activities had been to encourage Negro children to enter desegregated schools; that when parents considered sending children to schools with segregated faculties, they had fears that the teachers might show some prejudice and might not give their children the feeling of being wanted; and that there is also a fear that their children might not have the opportunity to participate in all school activities. Mr. Fritts also felt the parents of older children, and the children themselves, had fears that they might be called names, that there might be conflicts arising between children and the teachers, and that administrators would not intercede or be impartial. Mr. Fritts went on to testify that this was the third year his child had been in an integrated school, and that he experienced the same fears as those expressed by other parents when he first entered his child in a predominantly white school with an all white faculty. He concluded,

however, by stating that the experience with his own child had proved his fears to have been unfounded.

22. Elliott B. Palmer, Executive Secretary of the North Carolina Teachers Association, testified that he had received complaints in other North Carolina communities about the loss of jobs by Negro teachers because of the loss of population in Negro schools, and because of segregated faculty policies. However, he had no specific information concerning the Durham City School System.

23. Negro pupils who have requested assignment to predominantly white schools have participated in the full programs of those schools, including band, football, baseball and basketball. All such and similar activities have been offered to, and exercised by, all pupils on the same basis. The defendant Board has received no complaints from any Negro child or parent to the effect that any child assigned to a predominantly white school had been mistreated in any way, or had not been given equal opportunities within the school. In several instances, personal inquiry by school officials had been made of Negro students attending predominantly white schools, and in all such instances the Negro students had reported that they were getting along well with their teachers and white classmates, and had no complaints.

24. The plaintiffs have offered no direct evidence that Negro children in the Durham City School System, or parents, have been threatened or coerced, or have otherwise been reluctant to exercise their free choice of assignment, by reason of the present practices of the defendant Board in the employment and assignment of faculty members.

25. Under the freedom of choice system presently existing in the Durham City Schools, and under the plan for the enrollment and assignment of pupils during the 1966–1967 and subsequent school years, as filed with the Court on October 25, 1965, the parents of every child, white and Negro, are given the unrestricted right and opportunity to select

the school they desire their child to attend.

## DISCUSSION

There can be no question but that the comprehensive plan governing the enrollment and assignment of pupils in the Durham City School System for the 1966–1967 and subsequent school years, as embodied in the report filed with the Court by the defendant Board on October 25, 1965, is consistent in every respect with, and embodies every essential element of, the freedom of choice assignment plan approved by the Court of Appeals in Bradley v. School Board of City of Richmond, Virginia, 4 Cir., 345 F.2d 310 (1965), and cited with approval in Wheeler v. Durham City Board of Education, 4 Cir., 346 F.2d 768 (1965). It embraces a system whereby each student is accorded the truly unrestricted freedom to attend the school of his choice. It is true that the *Bradley* case was remanded by the Supreme Court [4] on the ground that the Court of Appeals should have remanded the matter to the district court for an evidentiary hearing on the relation between faculty allocations on an alleged racial basis and the adequacy of the desegregation plan, but the Supreme Court pointed out that it expressed no views on the merits of the case.

The plaintiffs, after a full evidentiary hearing, have totally failed to prove their allegation that there is any substantial relationship between the employment and assignment of teachers on a basis of race and the freedom of choice plan adopted by the defendant Board governing the enrollment and assignment of pupils, or that the method of employing and assigning teachers in any way renders inadequate the proposed plan for the enrollment and assignment of pupils.

It is interesting to note that none of the witnesses tendered by the plaintiffs as experts had any knowledge of information whatever concerning the freedom of choice plan presently being employed in the Durham City School System, and which the defendant Board proposes to

continue in the future, and that their testimony was confined to generalities and sociological theories. No specific examples were given. The one exception was Howard M. Fritts, Jr., and he stated that his earlier feelings with respect to the consequences of his child being enrolled in a predominantly white school, and taught by an all white faculty, had proved to be unfounded. The language of Judge Brown, in discussing testimony of a similar nature in Monroe v. Board of Com., City of Jackson, 244 F.Supp. 353 (W.D.Tenn., 1965), seems particularly appropriate:

"Plaintiffs offered some testimony from Negro parents that Negro pupils are reluctant to attend schools in which all of the teachers are white, some because they are afraid that the white teachers would require higher performance and perhaps others because they are afraid that they would not receive fair treatment. These witnesses gave no specific examples. It should be noted, however, that the intervening plaintiffs, at least, are seeking to attend schools with all white faculties. Plaintiffs' education experts largely testified in terms of the educational desirability of mixed faculties, but wo do not believe that this is a constitutional consideration. Plaintiffs' sociology expert testified that in his investigation of the question at Nashville he had not turned up much evidence that fear of going to school to all white teachers is a deterrent, but he also testified that having all Negro teachers stigmatizes a school as a 'Negro' school which tends to keep it segregated."

■ Since the testimony of plaintiff's witnesses was based on theory rather than existing problems, and since the plaintiffs have totally failed to prove their charge that freedom of choice on the part of students and their parents has in any way been coerced, discouraged or otherwise affected by placing teachers

4. 86 S.Ct. 224 (November 16, 1965).

in schools on the basis of race, it necessarily follows that the defendant Board is entitled to have the freedom of choice plan for the enrollment and assignment of pupils approved as being free of constitutional infirmities. Actually, the testimony of Myrl G. Herman, the most impressive witness offered by the plaintiffs, tends to disprove the plaintiffs' charge. While recognizing the desirability of assigning teachers without regard to race, Mr. Herman felt that school children received the greatest benefit by coming into contact with the people of other races and cultures. This benefit would be denied Negro children attending a predominantly white school if they were not also taught by white teachers.

It is rather apparent that what is being attempted here is to use the pupils as a vehicle for obtaining a desegregation of faculties without in any way involving teachers in the litigation. This the plaintiffs may not do. Teachers are clearly not within the class represented by the plaintiffs, and the plaintiffs cannot assert, or ask protection of, constitutional rights of others not parties to the action. Mapp v. Board of Education of City of Chattanooga, 6 Cir., 319 F.2d 571 (1963).

Nothing that has been said is to be construed as the Court condoning racial discrimination in the employment and assignment of teachers. On the contrary, any policy that requires, or even permits, any racial consideration whatever in the employment and placement of teacher personnel is clearly unlawful. Colorado Anti-Discrimination Comm'n. v. Continental Air Lines, Inc., 372 U.S. 714, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1963). However, as earlier noted, the constitutional rights of the teachers must be vindicated by the teachers themselves, not by some group or organization acting on their behalf. The plaintiffs only acquire standing by showing that they themselves are affected by the action complained of.

For the reasons stated, the defendant Board is entitled to an order approving its plan for the enrollment and assign-ment of pupils in the Durham City School System for 1966–1967 and subsequent school years, as embodied in its report of October 25, 1965. Consequently, an order is being entered approving said plan.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and of the subject matter.

2. The policies and practices of the defendant Board in the employment and assignment of teachers do not coerce, discourage, or interfere with the unrestricted freedom of pupils to be enrolled in, and assigned to, schools of their choice, and such plan is in all respects free of constitutional infirmities.

3. The application of the plaintiffs for an order requiring the employment and assignment of teachers in the Durham City School System without regard to race should be denied.