Warren H. WHEELER et al.,
and
C. C. Spaulding et al., Plaintiffs,

v.

The **DURHAM CITY BOARD OF EDUCATION**, a body politic in Durham, North Carolina, et al., Defendants.

Clarence **THOMPSON**, a minor, by Alice Thompson, his mother and next friend, et al., Plaintiffs,

v.

The **DURHAM COUNTY BOARD OF EDUCATION**, a body politic, and Dr. John Yeager, Superintendent of the Durham County Schools, et al., Defendants.

Nos. C–54–D–60, C–116–D–60 and C–140–D–63.

United States District Court,
M. D. North Carolina,
Durham Division.

July 30, 1974.

J. LeVonne Chambers of Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., for plaintiffs.

Marshall T. Spears and Jerry L. Jarvis, Durham, N. C., for Durham City Board of Education.

Robert Holleman, Durham, N. C., for Durham Board of County Commissioners.

James L. Newsom and A. H. Graham, Jr., Durham, N. C., for Durham County Board of Education.

W. I. Thornton, Jr., and Rufus C. Boutwell, Jr., Durham, N. C., for Durham City Council.

Andrew A. Vanore and Edwin M. Speas, Jr., Raleigh, N. C., for the Attorney General's Office, for the State Board of Education and State Superintendent.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION

GORDON, Chief Judge.

These consolidated cases were initially filed in 1960 and 1963 respectively, for disestablishment of separate segregated school systems in the Durham City Administrative School Unit and the Durham County Administrative School Unit. Since the entry of the original order in the respective cases, both school systems have been before the Court for new directions under the evolving case law. They are now before the Court, consolidated under a supplemental complaint filed on December 18, 1972, for determination of the plaintiffs' right under the Constitution to have the Court either:

(1) extend the boundaries of the Durham City Administrative School Unit so as to be coterminous with city limits of the City of Durham;

(2) order the merger or consolidation of the Durham City Administrative School Unit with that of the Durham County Administrative School Unit; or

(3) order the assignment of pupils interchangeably between the two school systems.

At the conclusion of the evidence at the trial on the merits, the Court advised counsel and the parties that it would render a decision after the receipt and study of briefs and proposed findings of fact and conclusions of law, which were directed filed with the Court within a stated time. The pleadings, exhibits, testimony, briefs, proposed findings of fact and conclusions of law, and arguments of counsel have been carefully considered and studied, and Findings of Fact and Conclusions of Law are made as follows:

### FINDINGS OF FACT

1. These actions, as they relate to the Durham City Board of Education, were filed in this Court in 1960 seeking desegregation of the Durham City Administrative School Unit. Wheeler v. Durham City Board of Education, C–54–D–60, and Spaulding v. Durham City Board of Education, C–116–D–60.

2. The companion case, Thompson v. County Board of Education, C–140–D–63, consolidated by order of this Court dated August 9, 1973, was filed in July, 1963, and sought desegregation of the Durham County Administrative School Unit.

3. On January 19, 1966, this Court approved a plan for desegregation of the City school system which embodied the unrestricted freedom of choice method of pupil assignment approved by the Court of Appeals in Bradley v. School

Board of Richmond, 345 F.2d 310 (4th Cir. 1965) and cited with approval in a previous appeal in this case in Wheeler v. Durham City Board of Education, 346 F.2d 768 (4th Cir. 1965); see opinion reported at 249 F.Supp. 145 (M.D.N.C. 1966). On plaintiffs' appeal, the Court of Appeals affirmed the pupil assignment plan, but directed further desegregation of faculties. Wheeler v. Durham City Board of Education, 363 F.2d 738 (4th Cir. 1966).

4. Meanwhile, following the institution of the County school desegregation suit in July, 1963, the Durham County Administrative School Unit assigned pupils under freedom of choice plans pursuant to "Consent Orders" entered by this Court on March 31, 1964 (governing assignments of pupils for the 1964–65 school year) and on May 21, 1965 (governing assignments of pupils through the 1968–69 school year).

5. In Green v. School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the United States Supreme Court held freedom of choice plans to be insufficient to effectuate the transition to a unitary system where there are reasonably available other ways, such as zoning, promising speedier and more effective conversions to a unitary, nonracial school system.

6. On June 19, 1968, following the decision of the Supreme Court in *Green, supra,* the plaintiffs in the Durham County action filed a motion for further relief, alleging that freedom of choice had been demonstrated to be ineffective to completely desegregate the Durham County schools. Thereafter, the County Board submitted, and this Court approved, a plan providing for conversion to geographical attendance zones in two phases beginning with the 1969–70 school year and being completed with the 1970–71 school year. The plaintiffs appealed, and while the appeal was pending the United States Supreme Court handed down its decision in Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), which made it clear that the

Court's mandate to boards of education was "to terminate dual school systems at once and to operate now and hereafter only unitary schools." Accordingly, on December 2, 1969, the United States Court of Appeals for the Fourth Circuit, in a consolidated opinion reported at 418 F.2d 1040, directed the immediate abandonment of "freedom of choice" in the Durham County schools and the employment of a geographic zoning plan in the assignment of pupils to achieve a unitary system. The Court further decreed that faculty in the schools be integrated so that the ratio of Negro and white faculty members at each school would be approximately the same as the ratio throughout the school system.

7. The mandate from the Court of Appeals directed the County Board "to submit to the District Court a plan for unitary schools on or before December 8, 1969," and that "each District Judge shall enter an order approving a Plan selected by him to achieve immediately a unitary school system." The records of this Court reflect that the Durham County Board submitted a plan for the establishment of a unitary school system which, after a hearing by Chief Judge Edwin M. Stanley on December 11, 1969, and without objection on the part of the plaintiffs, was approved as being in full compliance with the mandate from the Court of Appeals for the Fourth Circuit. As required by its mandate, Judge Stanley's order approving the plan was submitted to and also approved by the Court of Appeals.

8. The desegregation plan for the Durham County Administrative Unit, approved on December 11, 1969, has been in continuous effect in the Durham County schools since January, 1970. The County has been and is now acting in compliance with this plan.

9. On January 19, 1970, nine days following implementation of the County plan, the Durham County Administrative School Unit had 13,593 pupils enrolled in 14 elementary schools, 3 junior high schools, and 3 senior high schools, as follows:

| SCHOOL | GRADES | % | BLACK | WHITE | TOTAL |
|---|---|---|---|---|---|
| Kindergarten * | K | 74/26 | 67 | 24 | 91 |
| Bethesda | 1–6 | 11/89 | 74 | 593 | 667 |
| Bragtown | 1–6 | 37/63 | 194 | 334 | 528 |
| Glenn | 1–6 | 7/93 | 23 | 288 | 311 |
| Hillandale | 1–6 | 8/92 | 59 | 699 | 758 |
| Holt | 1–6 | 12/88 | 83 | 607 | 690 |
| Hope Valley | 1–6 | 20/80 | 132 | 527 | 659 |
| Lakeview | 1–6 | 36/64 | 62 | 110 | 172 |
| Little River | 1–6 | 26/74 | 145 | 425 | 570 |
| Lowe's Grove | 1–6 | 25/75 | 65 | 195 | 260 |
| Mangum | 1–6 | 57/43 | 132 | 99 | 231 |
| Merrick-Moore | 1–6 | 11/89 | 75 | 590 | 665 |
| Oak Grove | 1–6 | 15/85 | 80 | 453 | 533 |
| Parkwood | 1–6 | 7/93 | 33 | 413 | 446 |
| Pearsontown | 1–6 | 38/62 | 272 | 444 | 716 |
| Carrington | 7–9 | 21/79 | 310 | 1193 | 1503 |
| Githens | 7–9 | 27/73 | 244 | 665 | 909 |
| Neal | 7–9 | 12/88 | 122 | 869 | 991 |
| Jordan | 10–12 | 21/79 | 174 | 636 | 810 |
| Northern | 10–12 | 20/80 | 256 | 1003 | 1259 |
| Southern | 10–12 | 11/89 | 93 | 731 | 824 |
| Total | K–12 | 19.8/80.2 | 2695 | 10898 | 13593 |

* Kindergarten is taught in five elementary schools, to-wit: Little River; Lowe's Grove; Mangum; Merrick-Moore; Pearsontown.

10. In October, 1971, at the beginning of the 1971–72 school year, the Durham County Unit had 14,446 pupils in attendance, as follows:

| SCHOOL | GRADES | % | BLACK | WHITE | TOTAL |
|---|---|---|---|---|---|
| Bethesda | 1–6 | 13/87 | 82 | 564 | 646 |
| Bragtown | 1–7 | 45/55 | 303 | 371 | 674 |
| Glenn | 1–6 | 11/89 | 40 | 321 | 361 |
| Hillandale | 1–6 | 9/91 | 74 | 755 | 829 |
| Holt | 1–6 | 14/86 | 121 | 719 | 840 |
| Hope Valley | 1–7 | 9/91 | 60 | 598 | 658 |
| Lakeview | 1–6 | 33/67 | 62 | 125 | 187 |
| Little River | K–7 | 27/73 | 209 | 574 | 783 |
| Lowe's Grove | K–7 | 24/76 | 120 | 382 | 502 |
| Mangum | K–6 | 45/55 | 85 | 102 | 187 |
| Merrick-Moore | K–6 | 10/90 | 67 | 625 | 692 |
| Oak Grove | 1–7 | 11/89 | 103 | 827 | 930 |
| Parkwood | 1–5 | 7/93 | 26 | 361 | 387 |
| Pearsontown | K–7 | 37/63 | 328 | 563 | 891 |
| Carrington | 7–9 | 20/80 | 280 | 1116 | 1396 |
| Githens | 8–9 | 29/71 | 191 | 472 | 663 |
| Neal | 8–9 | 9/91 | 63 | 648 | 711 |
| Jordan | 10–12 | 22/78 | 175 | 637 | 812 |
| Northern | 10–12 | 18/82 | 244 | 1124 | 1368 |
| Southern | 10–12 | 8/92 | 75 | 810 | 885 |
| Total | K–12 | 18.8/81.2 | 2708 | 11694 | 14402 |

Additionally, the system had 40 American Indians, Orientals and Spanish American surnamed pupils for a total of 14,446.

11.  As of September 8, 1972, shortly after the beginning of the 1972–73 school year, the Durham County Unit had 14,901 pupils in attendance, as follows:

| SCHOOL | GRADES | % | BLACK | WHITE | TOTAL |
|---|---|---|---|---|---|
| Bethesda | 1–6 | 14/86 | 89 | 566 | 655 |
| Bragtown | 1–6 | 63/37 | 446 | 267 | 713 |
| Glenn | 1–6 | 9/91 | 31 | 306 | 337 |
| Hillandale | 1–6 | 11/89 | 92 | 720 | 812 |
| Holt | 1–6 | 17/83 | 150 | 719 | 869 |
| Hope Valley | 1–7 | 11/89 | 78 | 613 | 691 |
| Lakeview | 1–6 | 57/43 | 114 | 85 | 199 |
| Little River | K–6 | 21/79 | 140 | 528 | 668 |
| Lowe's Grove | K–7 | 25/75 | 114 | 341 | 455 |
| Mangum | K–6 | 47/53 | 82 | 93 | 175 |
| Merrick-Moore | K–6 | 13/87 | 99 | 642 | 741 |
| Oak Grove | K–7 | 21/79 | 206 | 772 | 978 |
| Parkwood | 1–5 | 7/93 | 27 | 338 | 365 |
| Pearsontown | K–7 | 37/63 | 314 | 530 | 844 |
| Carrington | 7–9 | 25/75 | 436 | 1322 | 1758 |
| Githens | 8–9 | 27/73 | 183 | 491 | 674 |
| Neal | 8–9 | 13/82 | 102 | 685 | 787 |
| Jordan | 10–12 | 20/80 | 168 | 662 | 830 |
| Northern | 10–12 | 21/79 | 295 | 1144 | 1439 |
| Southern | 10–12 | 12/88 | 105 | 806 | 911 |
| Total | K–12 | 22/78 | 3271 | 11630 | 14901 |

12.  As of October 15, 1973, shortly after the beginning of the 1973–74 school year, the Durham County Unit had 15,633 pupils enrolled as follows:

| SCHOOL | GRADES | % | BLACK | WHITE | TOTAL |
|---|---|---|---|---|---|
| Bethesda | 1–6 | 15/85 | 90 | 523 | 613 |
| Bragtown | 1–6 | 73/27 | 576 | 209 | 785 |
| Glenn | 1–6 | 9/91 | 33 | 302 | 353 |
| Hillandale | 1–6 | 15/85 | 116 | 636 | 752 |
| Holt | 1–6 | 19/81 | 162 | 710 | 872 |
| Hope Valley | 1–7 | 10/90 | 65 | 570 | 635 |
| Lakeview | 1–6 | 67/33 | 200 | 99 | 299 |
| Little River | K–6 | 19/81 | 132 | 558 | 690 |
| Lowe's Grove | K–7 | 27/73 | 119 | 324 | 443 |
| Mangum | K–6 | 37/63 | 62 | 105 | 167 |
| Merrick-Moore | K–6 | 19/81 | 149 | 649 | 798 |
| Oak Grove | K–7 | 29/71 | 218 | 528 | 746 |
| Parkwood | 1–5 | 6/94 | 23 | 356 | 379 |
| Pearsontown | K–7 | 37/63 | 322 | 543 | 865 |
| Carrington | 7–9 | 25/75 | 325 | 961 | 1286 |
| Chewning | 7–9 | 34/66 | 215 | 413 | 628 |
| Githens | 8–9 | 24/76 | 158 | 507 | 665 |
| Neal | 8–9 | 17/83 | 211 | 1043 | 1254 |
| Jordan | 10–12 | 24/76 | 213 | 663 | 876 |
| Northern | 10–12 | 22/78 | 347 | 1200 | 1547 |
| Southern | 10–12 | 14/86 | 134 | 846 | 980 |
| Total | K–12 | 25/75 | 3870 | 11763 | 15633 |

13. On February 19, 1970, the plaintiffs in the Durham City school cases filed a motion for further relief in which they asked this Court to direct the City Board to also abandon the freedom of choice plan of assignments and to submit a new plan for complete desegregation of the City school system in accordance with the decisions of the United States Supreme Court in *Green, supra,* and *Alexander, supra,* and the decision of the Court of Appeals for the Fourth Circuit in Thompson v. Durham County Board of Education, 418 F.2d 1040 (4th Cir. 1969).

14. On March 13, 1970, the Durham City Board of Education filed a response to the motion for further relief requesting that it be permitted to submit to the Court a plan for further desegregation of the Durham City school system to be fully implemented with the commencement of the 1970–71 school term. With the consent of counsel for plaintiffs, the defendant Board was directed to submit a plan for further desegregation of the Durham City schools on or before June 29, 1970.

15. This plan, as modified by the Court and approved by order dated July 31, 1970, provides for the assignment of pupils to two high schools, six junior high schools, and sixteen elementary schools pursuant to geographical attendance zones. The zones were drawn to achieve optimum mixing of the races in all schools, and paired three formerly black elementary schools with three formerly white elementary schools. Faculties are assigned so that the ratio of black to white members at each school is approximately the same as the ratio throughout the system.

16. Based upon the residences of the pupils at the end of the 1969–70 school year, it was projected that the geographical assignment plan would result in pupil compositions, by race, in the various city schools at the beginning of the 1970–71 school year as follows:

| SCHOOL | GRADES | % | BLACK | WHITE | TOTAL |
|---|---|---|---|---|---|
| Durham High | 10–12 | 50/50 | 809 | 795 | 1604 |
| Hillside High | 10–12 | 58/42 | 744 | 535 | 1279 |
| Brogden Jr. High | 7–9 | 21/79 | 133 | 502 | 635 |
| Carr Jr. High | 7–9 | 49/51 | 207 | 218 | 425 |
| Holton Jr. High | 7–9 | 53/47 | 274 | 245 | 519 |
| Rogers-Herr Jr. High | 7–9 | 66/34 | 315 | 160 | 475 |
| Shepard Jr. High | 7–9 | 79/21 | 418 | 110 | 528 |
| Whitted Jr. High | 7–9 | 82/18 | 640 | 145 | 785 |
| Burton | 1–6 | 69/31 | 360 | 163 | 523 |
| Club Boulevard | 4–6 | | | | |
| East End | 1–3 | 43/57 | 407 | 542 | 949 |
| Fayetteville St. | 3–6 | 75/25 | 414 | 140 | 554 |
| R. N. Harris | 1–2 | 57/43 | 155 | 118 | 273 |
| Holloway St. | 1–6 | 50/50 | 253 | 251 | 504 |
| Lakewood | 1–2 | 75/25 | 206 | 70 | 276 |
| Lyon Park | 1–6 | 64/36 | 235 | 130 | 365 |
| Morehead | 1–6 | 67/33 | 195 | 95 | 290 |
| North Durham | 1–6 | 59/41 | 135 | 93 | 228 |
| W. G. Pearson | 1–6 | 90/10 | 696 | 73 | 769 |
| E. K. Powe | 1–6 | 29/71 | 148 | 362 | 510 |
| Y. E. Smith | 3–6 | 57/43 | 310 | 237 | 547 |
| C. C. Spaulding | 1–6 | 86/14 | 424 | 69 | 493 |
| Walltown | 1–6 | 46/54 | 125 | 148 | 273 |
| George Watts | 1–6 | 36/64 | 101 | 176 | 277 |
| Totals | | 59/41 | 7704 | 5377 | 13081 |

17. The actual enrollments in the various city schools on October 1, 1970 (1970–71 school year) were as follows:

| SCHOOL | GRADES | % | BLACK | WHITE | TOTAL |
|---|---|---|---|---|---|
| Durham High | 10–12 | 46/54 | 764 | 901 | 1665 |
| Hillside High | 10–12 | 69/31 | 857 | 389 | 1247 |
| Brogden Jr. High | 7–9 | 21/79 | 139 | 511 | 650 |
| Carr Jr. High | 7–9 | 48/52 | 186 | 201 | 387 |
| Holton Jr. High | 7–9 | 45/55 | 277 | 342 | 619 |
| Rogers-Herr Jr. High | 7–9 | 69/31 | 333 | 150 | 483 |
| Shepard Jr. High | 7–9 | 92/8 | 453 | 38 | 491 |
| Whitted Jr. High | 7–9 | 93/7 | 731 | 54 | 785 |
| Burton | 1–6 | 85/15 | 503 | 92 | 595 |
| Club Boulevard | 4–6 | 44/56 | 175 | 222 | 397 |
| East End | 1–3 | 59/41 | 269 | 189 | 458 |
| Fayetteville Street | 3–6 | 80/20 | 438 | 111 | 549 |
| R. N. Harris | 1–2 | 73/17 | 230 | 85 | 315 |
| Holloway Street | 1–6 | 43/57 | 220 | 190 | 510 |
| Lakewood | 1–2 | 73/17 | 201 | 76 | 277 |
| Lyon Park | 1–6 | 79/21 | 224 | 61 | 285 |
| Morehead | 1–6 | 65/35 | 205 | 108 | 313 |
| North Durham | 1–6 | 60/40 | 140 | 93 | 233 |
| W. G. Pearson | 1–6 | 95/5 | 680 | 35 | 715 |
| E. K. Powe | 1–6 | 25/75 | 119 | 349 | 468 |
| Y. E. Smith | 3–6 | 60/40 | 338 | 223 | 561 |
| C. C. Spaulding | 1–6 | 97/3 | 491 | 14 | 505 |
| Walltown | 1–6 | 46/54 | 113 | 131 | 244 |
| George Watts | 1–6 | 35/65 | 112 | 210 | 322 |
| Totals | | 63/37 | 8198 | 4875 | 13073 |

Additionally, the system had 20 American Indians, Orientals and Spanish American surnamed students for a total of 13,093.

18. The enrollments in the various city schools on September 20, 1971 (1971–72 school year) were as follows:

| SCHOOL | GRADES | % | BLACK | WHITE | TOTAL |
|---|---|---|---|---|---|
| Durham High | 10–12 | 49/51 | 742 | 776 | 1518 |
| Hillside High | 10–12 | 69/31 | 847 | 388 | 1235 |
| Brogden Jr. High | 7–9 | 21/79 | 121 | 442 | 563 |
| Carr Jr. High | 7–9 | 49/51 | 183 | 190 | 373 |
| Holton Jr. High | 7–9 | 49/51 | 301 | 319 | 620 |
| Rogers-Herr Jr. High | 7–9 | 72/28 | 317 | 125 | 442 |
| Shepard Jr. High | 7–9 | 92/8 | 445 | 38 | 483 |
| Whitted Jr. High | 7–9 | 92/8 | 677 | 55 | 732 |
| Burton | 1–6 | 86/14 | 497 | 82 | 579 |
| Club Boulevard | 4–6 | 48/52 | 193 | 211 | 404 |
| East End | 1–3 | 62/38 | 257 | 156 | 413 |
| Fayetteville Street | 3–6 | 78/22 | 442 | 123 | 565 |
| R. N. Harris | 1–2 | 76/24 | 210 | 67 | 277 |
| Holloway Street | 1–6 | 51/49 | 236 | 226 | 462 |
| Lakewood | 1–2 | 72/28 | 187 | 71 | 258 |

| SCHOOL | GRADES | % | BLACK | WHITE | TOTAL |
|--------|--------|---|-------|-------|-------|
| Lyon Park | 1–6 | 74/16 | 165 | 57 | 222 |
| Morehead | 1–6 | 75/25 | 186 | 61 | 247 |
| North Durham | 1–6 | 62/38 | 123 | 76 | 199 |
| W. G. Pearson | 1–6 | 95/5 | 617 | 35 | 652 |
| E. K. Powe | 1–6 | 31/69 | 125 | 282 | 407 |
| Y. E. Smith | 3–6 | 67/33 | 354 | 172 | 526 |
| C. C. Spaulding | 1–6 | 97/3 | 463 | 12 | 475 |
| Walltown | 1–6 | 44/56 | 97 | 123 | 220 |
| George Watts | 1–6 | 43/57 | 124 | 165 | 289 |
| Totals | | 65/35 | 7909 | 4252 | 12161 |

19. The enrollments in the various city schools on September 7, 1973 (1973–74 school year) were as follows:

| SCHOOL | GRADES | % | BLACK | WHITE | TOTAL |
|--------|--------|---|-------|-------|-------|
| Durham High | 10–12 | 55/45 | 688 | 559 | 1247 |
| Hillside High | 10–12 | 78/22 | 945 | 261 | 1206 |
| Brogden Jr. High | 7–9 | 20/80 | 86 | 355 | 441 |
| Carr Jr. High | 7–9 | 61/39 | 196 | 124 | 320 |
| Holton Jr. High | 7–9 | 49/51 | 254 | 260 | 514 |
| Rogers-Herr Jr. High | 7–9 | 81/19 | 310 | 71 | 381 |
| Shepard Jr. High | 7–9 | 96/4 | 448 | 17 | 465 |
| Whitted Jr. High | 7–9 | 93/7 | 498 | 37 | 535 |
| Burton | 1–6 | 93/7 | 456 | 36 | 492 |
| Club Boulevard | 4–6 | 58/42 | 189 | 137 | 326 |
| East End | 1–3 | 63/37 | 183 | 108 | 291 |
| Fayetteville Street | 3–6 | 89/11 | 452 | 57 | 509 |
| R. N. Harris | 1–2 | 82/18 | 196 | 42 | 238 |
| Holloway Street | 1–6 | 54/46 | 189 | 162 | 351 |
| Lakewood | 1–2 | 82/18 | 160 | 35 | 195 |
| Lyon Park | 1–6 | 82/18 | 141 | 31 | 172 |
| Morehead | 1–6 | 66/34 | 115 | 60 | 175 |
| North Durham | 1–6 | 70/30 | 130 | 56 | 186 |
| W. G. Pearson | 1–6 | 98/2 | 424 | 9 | 433 |
| E. K. Powe | 1–6 | 28/72 | 80 | 205 | 285 |
| Y. E. Smith | 3–6 | 76/24 | 336 | 107 | 443 |
| C. C. Spaulding | 1–6 | 97/3 | 390 | 12 | 402 |
| Walltown | 1–6 | 51/49 | 90 | 88 | 178 |
| George Watts | 1–6 | 45/55 | 95 | 115 | 210 |
| Cooperative | | 92/7 | 36 | 3 | 39 |
| Totals | | 71/29 | 7087 | 2947 | 10034 |

Additionally, the system has 188 educables, 132 trainable, 307 kindergarten, 37 American Indians, Orientals and Spanish American surnamed students for a total of 10,698 students.

20. The assignment maps attached to the plan approved July 31, 1970, clearly demonstrate that the Board employed drastic gerrymandering of attendance zones and some pairings of racially identifiable schools in an effort to attain an optimum degree of integration. However, as shown by the projections of pupil compositions under the plan, it was

anticipated by the Board and the Court that despite the gerrymandering of zones and the pairing of schools, a few schools would exist in which pupils of one race would constitute a small percentage of the total pupil enrollment.

21. The desegregation plan adopted by this Court on July 31, 1970, was fully implemented by the Durham City Board of Education beginning with the 1970–71 school year, and has been administered in each ensuing year in full compliance with this Court's order.

22. All racial distinctions have been eliminated in the operation of the schools in both the Durham City Administrative School Unit and the Durham County Administrative School Unit. The plaintiffs make no contention or showing that invidious discrimination exists with respect to educational programs, extracurricular activities, transportation, supporting personnel in either unit or that the Court approved plans have not been faithfully and fairly administered.

23. Each year, faculty assignments have been made in the schools in each unit in a ratio of white to black faculty members substantially the same throughout each respective system.

24. The plaintiffs make no contention that any school construction or abandonment, or future plans for such, have been made by the Boards of Education for the purpose of perpetuating or re-establishing segregation in either system.

25. The desegregation plan for the Durham County schools, approved by Judge Stanley on December 11, 1969, fully complied with the mandate of the United States Court of Appeals for the Fourth Circuit in Thompson v. Durham County Board of Education, *supra*, directing that "each district judge shall enter an order approving a plan selected by him to achieve immediately a unitary school system." Upon its implementation of that plan in the Durham County schools in January, 1970, the Durham County Board of Education acted effec-

tively to disestablish the formerly state-imposed dual school system within its administrative school unit, and since that time it has complied with its constitutional duty to operate a "unitary" school system "within which no person is to be effectively excluded from any school because of race or color."

26. The desegregation plan for the Durham City schools, approved by Judge Stanley on July 31, 1970, was designed to achieve immediately a unitary school system in the Durham City Administrative School Unit, as had been directed in the *Thompson* case by the Court of Appeals. Upon the implementation of that plan, beginning with the 1970–71 school year, the Durham City Board of Education acted effectively to disestablish the formerly state-imposed dual school system within its administrative unit, and since that time it has complied with its constitutional duty to operate a "unitary" school system.

27. By reason of demographic changes in the communities served by the two school systems, each has undergone substantial changes during the four school years since implementation of its court-ordered plan. In the City system pupil population has dropped from 13,093 in the 1970–71 school year to 10,698 in the 1973–74 school year, and the racial composition of pupils has changed from 63 percent black and 37 percent white in 1970 to 71 percent black and 29 percent white in 1974. In the County system pupil population has increased from 13,593 in the 1970–71 school year to 15,633 in the 1973–74 school year, and the racial composition of pupils has changed from 19.8 percent black in 1970–71 to 25 percent black in 1973–74.

The trend in the City system is typical of patterns in many urban areas: decreasing pupil population accompanied by an increase in the percentage of blacks. However, the suburban County system, although increasing in total pupil population, is also increasing in the percentage of blacks. This phenomenon

is due, in part, to the construction in 1971–72 of two low-income housing projects (Oxford Manor and Kerrwood Estates) within the boundaries of the County system by the Housing Authority of the City of Durham. At the same time the Redevelopment Commission of the City of Durham relocated over 350 black families with approximately 1500 minor children into these projects from the inner city. Additionally, the trend in the City of Durham has been for blacks in the upper social and economic levels to migrate to suburban and rural areas. There has been no interaction between the Boards of Education, or among any of the parties defendant, for the purpose of impeding desegregation in either school system or to keep the County system relatively white by confining blacks to the City system.

28. The present trend can be expected to continue and the Durham City schools will increase in the percentage of black students enrolled. The plan in effect during 1973–74 varied in the percentage of blacks in each school from 20 percent at Brogden Junior High School to 97 percent at C. C. Spaulding. Ten schools were more than 80 percent black. During the 1970–71 school year, six schools had black enrollments of more than 80 percent.

The educational program of the City schools has also suffered. According to the city superintendent, the annual achievement test scores have deteriorated as has the educational program generally.

29. Durham County, North Carolina, was established in 1881 and has a geographical area of 299 square miles. It embraces one municipality, the City of Durham, located near its center which was created in 1890. The City's original geographical area of a single square mile has been periodically expanded by annexation of adjacent County areas reaching its present area of 39.7 square miles on June 30, 1974, at which time 1.-171 square miles were annexed. The corporate boundaries of the City of Dur-

ham encompasses 13.28 percent of the total area of Durham County.

30. The Durham City Administrative School Unit is not coterminous with the corporate boundaries of the City of Durham. The City school unit has a geographical area of approximately 18.34 square miles and lies wholly within the corporate boundaries.

31. The boundaries of the City school unit and the corporate limits were coterminous after the general annexation of 1925, and remained so after the annexation of the Duke University west campus in 1937.

32. As early as 1932 the voters residing in the Durham City Administrative School Unit voted upon themselves a special supplemental tax, pursuant to the provisions of G.S. 115–77, in the amount of 20 cents per $100.00 valuation. In 1948 this rate was increased by another referendum to 40 cents per $100.00 valuation and has remained constant since that time.

33. Following the establishment of the supplemental school tax for the City school unit in 1932, the policy was adopted whereby any petition or vote for annexation into the corporate limits required voter approval of the supplemental school tax in order for the annexed area to be included within the Durham City Administrative School Unit.

34. In 1955, pursuant to G.S. § 115–116(a), voters residing in the Durham County Administrative School Unit approved a supplemental school tax, not to exceed 20 cents per $100.00 valuation of property. At this time the supplemental school tax in the Durham City Administrative School Unit had already been increased to 40 cents per $100.00 of valuation.

35. During 1955 and 1956 several suburban residential areas adjoining the Durham city limits petitioned to be and were annexed into the City, but were not automatically joined to the Durham City Administrative School Unit by reason of the supplemental tax. On June 26, 1956, following petitions approved by both

Boards of Education and the Durham County Commissioners, the voters residing in the Wellons Village-Hardee Street area, the Forest Road area, and the Arnolda area of Rockwood, all predominantly white areas of the County school system, and the Oakwood Park area, a predominantly black community, all of which had been annexed previously into the City of Durham, voted to transfer their areas into the Durham City Administrative School Unit and to assume its supplemental tax. Other areas which had been previously annexed did not make similar petitions. Thus, for the first time the corporate limits and the boundaries of the City school system ceased to be coterminous.

36. In 1957 the North Carolina General Assembly enacted a local law applicable to the City of Durham, designated as Chapter 1099 of the Session Laws of 1957, which authorized the City Council of the City of Durham to extend the corporate limits without a vote of the people in the areas proposed to be annexed. Pursuant to this authority, on November 18, 1957, the City Council enacted an ordinance annexing four major areas into the city limits.

37. At the end of the 1959–60 school year the four areas annexed in 1957 still remained in the Durham County Administrative School Unit, these being the Mutual Heights area, a predominantly black area, and the Bragtown-Eastern Durham area, the Cornwallis Road area, and the Hillandale-Poplar Apartments area, all predominantly white. On September 17, 1960, upon petition of the residents of these areas, an election was held to determine whether the respective areas would be transferred into the City Administrative School Unit and made subject to that system's supplemental tax. The Mutual Heights area voted itself into the City system, and each of the other three areas voted to remain in the County system.

38. Meanwhile, two predominantly white areas, the Glendale Heights area in the northern section and the Duke Forest-Tuscaloosa area in the western section, had been annexed into the city limits by petition and annexation ordinances. These areas subsequently voted on June 6, 1959, to transfer from the County school system to the City school system and to assume the latter's supplemental tax.

39. In 1959, the General Assembly enacted a State-wide law authorizing annexation of territory by the governing boards of municipalities having a population of 5,000 or more persons without a vote of the electorate (G.S. § 160A–45 et seq.). These statutes are based upon State policy that sound urban development is essential to the continued economic development of North Carolina, and upon the further State policy that municipal boundaries should be extended in accordance with legislative standards applicable throughout the State to provide the high quality of government services needed for the public health, safety and welfare. These statutes contain no provision affecting school unit boundaries.

40. Again, on January 1, 1966, the Durham City Council, by ordinance, annexed substantial additional areas into the corporate limits. Following this annexation only two communities, Royal Oak and Forrest View Heights, both predominantly black, voted in May, 1968, and May, 1970, respectively, to transfer from the County school system to the City school system.

41. The "City-Out" (a term used to describe the area of the City of Durham within the boundaries of the Durham County Administrative School Unit) consists of those areas annexed by the Durham City Council since 1955 in which the residents have specifically voted not to transfer their schools and property into the Durham City Administrative School Unit. This area has not been carved out of the City school unit to create a special enclave for white city residents. This area of the Durham County Administrative School Unit has the highest percentage of black pupils of

any area in the County system. Of the 4,657 pupils residing in the "city-out" area, 1,991 are black, approximately 42.8 percent. The County Administrative School Unit ratio as a whole is approximately 75 percent white and 25 percent black. Based upon all statistics presently available, there has been a proportionately greater growth in the black population in this area than the growth of white population.

42. The fact that the Durham City Administrative School Unit embraces less than one-half the total area within the city limits of Durham has not resulted from some covert and devious purpose on the part of the defendants, singularly or in concert, to circumvent or impede the process of desegregation in the two school systems.

43. Apparently, the non-coterminous relationships between the City of Durham and the Durham City Administrative School Unit is the rule across the country rather than the exception. According to the testimony of Dr. John Frank Yeager, Jr., recently appointed Superintendent of the Durham County school system with broad training and experience in school administration, Tennessee is now the only remaining state in which a municipal school system is automatically extended to be coterminous with municipal boundaries upon annexation of territory. This development has resulted from the myriad practical problems of administration, finance and planning which are attendant in school districts subject to modification by municipal annexation occasioned by considerations wholly unrelated to the administration of public education.

44. Article IX of the North Carolina Constitution charges the General Assembly with the establishment and maintenance of a general and uniform system of free public schools. Chapter 115 of the General Statutes embodies the legislative plan of elementary and secondary education in North Carolina. It imposes the duty to assign children residing within each city and county administrative unit, as well as the general control and supervision of the schools within the respective units, upon city and county boards of education. G.S. § 115–176.1; G.S. § 115–35.

45. By virtue of G.S. § 115–4 the area presently within the Durham County Administrative School Unit has always been a part of that unit. It embraces the entire area of Durham County with the exception of approximately 46 percent of the City of Durham which is within the Durham City Administrative School Unit.

46. It is, and always has been, beyond the power of the Durham City Board of Education to unilaterally alter or enlarge its administrative boundaries to conform to the corporate limits of the City of Durham. Neither can the Durham County Board of Education transfer any of its territory to the city administrative unit.

47. A county administrative unit may relinquish territory and a city administrative unit may acquire additional territory only through one of two statutory procedures. G.S. § 115–77 permits a county board of education, with the approval of the State Board of Education and the affected city board of education, to transfer *from nontax territory* and permanently annex to a city administrative unit contiguous real property upon the written application of all owners of such property and the taxpayers of all families living on such property. The second method whereby a city administrative unit may be enlarged is by a majority vote of the people residing in the area sought to be added to the city unit, pursuant to G.S. § 115–116, et seq., but only with the approval of both city and county boards of education.

48. A complete consolidation and merger of a county and city administrative school unit located in the same county may be accomplished, pursuant to G.S. § 115–74.1, by the concurrence of both boards of education and the board of county commissioners, with the approval of the State Board of Education.

Such a merger may be, but is not required to be, subject to the approval of the voters in the affected geographic area. A differential in the supplemental tax rate is no bar to the use of this procedure.

49. The first mentioned method for enlargement of a city administrative unit, under G.S. § 115–77, has not been applicable to the Durham City and Durham County Administrative Units since 1955, inasmuch as no area of the county administrative unit has been "nontax territory" since that time. In 1955, pursuant to G.S. § 115–116(a), the voters residing in the Durham County Administrative Unit approved a special tax, not to exceed 20 cents per $100.00 valuation of property, to supplement the current expense funds derived from state and county allotments. Since the special tax was approved, it has been continuously levied and collected at the rate of 20 cents per $100.00 valuation, and the Durham County Unit has ceased to be a "nontax territory" within the meaning of G.S. § 115–77.

50. In 1968, a committee appointed by the Governor published a report, "The Report of the Governor's Study Commission on the Public School System of North Carolina," which recommends the consolidation of the small city-county school districts. Chapter 3 of the Report deals with organizing North Carolina's public schools. Recommendation 85 states:

"So that North Carolina can provide economical and effective schools, the Commission recommends that the State adopt the county as the basic school administrative unit. Merger of city units with county units and, where necessary, merger across county lines should be accomplished in order to achieve sound educational programs. The State Board of Education should be empowered by the legislature to develop criteria for such mergers, taking into account geographic conditions and other relevant factors. Merger should be accomplished as speedily as local conditions permit."

Several school units in North Carolina have been merged, reducing the number of units from more than 184 in 1960 to 152 in 1973–74.

51. In 1958 the Durham City and County Boards of Education jointly petitioned the Durham County Board of Commissioners for a county-wide referendum to determine whether the two administrative units should be consolidated with authorization for a county-wide special tax equal to the supplemental tax then authorized in the city administrative unit. The election was held in 1959 and resulted in a decisive rejection of the consolidation proposal.

52. As late as July, 1971, the two administrative units again adopted a Plan of Merger pursuant to G.S. § 115–74.1, subject to the approval of the Board of County Commissioners, the State Board of Education, and the voters of Durham County. Approval was given by everyone except the voters who again overwhelmingly rejected consolidation.

53. A merger of the Durham County and the Durham City administrative units is both feasible and practical. At present the city and county units operate a joint special education program at the County Lakeview School, with students from the City and County being transported to the school. The City and County Boards also operate jointly a special school for pregnant girls.

The Durham County schools are to some extent overcrowded and the City schools are underutilized. The overcrowded conditions of the County schools necessitated split sessions of classes at Carrington Junior High School during the last school year. The construction of the first stage of Chewning Junior High School, scheduled to be available for occupancy in September, 1974, will substantially alleviate this condition. The merger of the Durham County and City school systems or the implementation of a school assignment plan to effect the same result, could result in a more efficient use of existing resources.

54. If the City and County units were merged, the two units would have a total student enrollment of approximately 25,600 students, 14,700 white or 58 percent and 10,900 black or 42 percent. This racial makeup of the system would provide for a more stable desegregated system and, as the evidence indicates, could improve the educational program for both the city and county students.

55. If the city limits marked the boundaries of the city school system, city school systems would have approximately 14,800 students, 9,100 black or 61 percent and 5,700 white or 39 percent.

56. Based upon all the evidence, the Court finds as a fact that the establishment or maintenance of the separate school systems designated as the Durham County Administrative School Unit and the Durham City Administrative School Unit, in the past and as they presently exist, has not circumvented or impaired any federally protected right of the plaintiffs or the class they represent, and therefore it is beyond the remedial authority of this Court to require the merger or consolidation of the two systems, in whole or in part, or to require the assignment of pupils between the two systems without regard to their duly and lawfully established boundaries.

57. The affirmative duty of the defendants, Boards of Education, to disestablish the formerly dual system of schools in their respective administrative units has been accomplished. This is the extent, under current law, as hereafter concluded, of their affirmative constitutional obligations. Neither school authorities nor this Court are consitutionally required to make year-by-year adjustments in the racial composition of student bodies because of demographic changes in the communities served by the school systems. Nevertheless, in the exercise of the broad discretionary powers conferred upon them by statute, and fully acknowledged by the courts, to formulate and implement educational policy, both Boards have been studying changes in their court-approved assignment plans in order to develop more effective educational programs and to achieve levels of racial integration in their schools more closely reflecting the proportions in the respective systems. It is contemplated that both Boards of Education will submit proposals for such changes to this Court, from time to time, and, in the absence of any invidious discrimination or resegregation by official action, the desirability for such changes will be for the respective Boards to determine.

58. By reason of the demographic changes in the communities served by the school system, during the 1971–72 and 1972–73 school years the Durham City Board of Education and its administrative staff made extensive studies of pupil populations, facilities, and transportation in order to determine if alternative constitutionally acceptable pupil assignment plans could be developed. They were aided in their efforts by independent research and suggestions from interested citizens and community groups, and kept counsel for the plaintiffs periodically advised of their deliberations.

59. The Board's deliberations and studies did not result in the final adoption of a plan to be presented to the Court for approval, although proposals for modifications in geographic attendance zones at the high school, junior high school and elementary school levels were submitted to counsel for the plaintiffs and were also put on public display for a period of twenty days during the spring of 1972. This "Plan" was introduced at the October 25, 1973, hearing as plaintiffs' exhibits 11 through 16, inclusive.

60. If the high school attendance zones had been modified in accordance with this plan at the beginning of the 1972–73 school year, it was projected that enrollment in the two high schools would have been: Durham High, 668

black (53%) and 592 white (47%); Hillside High, 881 black (63%) and 508 white (37%).

61. If the junior high school attendance zones had been modified in accordance with this plan at the beginning of the 1972-73 school year, it was projected that the five junior high schools (Carr Junior High School would have been closed) would have been:

Brogden, 339 black (56%) and 266 white (44%);

Holton, 278 black (50%) and 274 white (50%);

Rogers-Herr, 323 black (63%) and 188 white (37%);

Shepard, 356 black (70%) and 154 white (30%);

Whitted, 683 black (73%) and 307 white (27%).

62. If the elementary school attendance zones had been modified in accordance with this plan at the beginning of the 1972-73 school year, Lyon Park Elementary School would have been closed and six additional elementary schools would have been paired (all but three, i. e., North Durham, Walltown and George Watts, would have been paired). All elementary schools would have been majority black with percentages ranging from 56 percent to 74 percent.

63. When the plaintiffs filed the motion for further relief on July 25, 1972, in which they prayed that this Court require the Durham City Board of Education to submit desegregation plans for the entire area covered by the corporate limits of the City of Durham, including five elementary schools located in and operated by the Durham County Administrative School Unit, the City Board ceased consideration of modifications of attendance zones within the existing boundaries of the school system, in view of the possibility of two major changes in pupil assignments within one school year, should the Court have decreed the enlargement of the City system or the merger of the City and County systems as requested by the plaintiffs.

64. The proposals submitted by the Durham City Board of Education, if adopted, will effect substantial progress in the further desegregation of the Durham City Administrative School Unit, although this Court specifically refrains from deciding that such action is constitutionally required. These proposals, of course, should not be adopted at the present time, without due consideration of demographic changes which have occurred in the interim.

65. The Durham County Board of Education has presented to the Court in the form of a motion (filed July 8, 1974) a plan for the further desegregation of the Durham County schools. This plan is intended to be implemented in the 1974-75 school year.

66. If implemented, this plan will effect substantial progress in the further desegregation of the Durham County public school system and will alleviate much of the present overcrowding. (The detailed provisions of the plan, as set out in the previously referred to motion of the Durham County Board of Education, are hereby incorporated into and made a part of the Findings of Fact and Conclusions of Law herein set forth.)

67. At the May, 1974, hearing the plaintiffs presented proposed alternative desegregation plans for merger of the City and County units, for extension of the City unit to be coterminous with the city limits of Durham and for desegregation of the two units as separate school systems. Plan 1, dealing with desegregation of both units as a separate consolidated entity reflects ratio of students in each school varying from 32 percent black to 50 percent black. The plan utilized grids for attendance districts and if implemented, the attendance areas would have to be placed along natural boundaries. The plan demonstrates, however, that the schools can be racially mixed as a merged unit without extensive transportation.

68. Plan 2 projects desegregation of the city system with the boundaries

being coterminous with the city limits of Durham. It projects the ratio of black students varying from 50 percent black to 63 percent black. This plan also projects the inclusion of Jordan High School as well as Lakeview, Bragtown, Holt, Hope Valley and Hillandale into the City school system. Plan 3 projects desegregation of the County schools with the city-out area added to the city school unit. It projects that all students could be accommodated in the remaining elementary, junior and senior high schools with utilization of the county schools ranging from 71 percent to 98 percent compared with the present utilization of 51 percent to 167 percent.

69. Plan 4 projects desegregation of the city schools with the district remaining as it presently is. The percentage of blacks in the schools would range from 63 percent to 74 percent. Plan 5 projects desegregation of the county schools with its present boundaries. The percentage of blacks in the school would range from 17 percent to 31 percent.

70. The various plans of the plaintiffs demonstrate that the schools can be more effectively desegregated. They further demonstrate that the City unit could be extended to be coterminous with the city limits of Durham and the schools in the City and County capable of accommodating the space and education needs of the students. The proposed merger plan further demonstrates that the City and County units could be merged and effectively desegregated without extensive transportation for students.

## DISCUSSION

This litigation is representative of a new generation of school desegregation cases which will inevitably increase in number as the situation presented here manifests itself in other school districts throughout the country. For this reason, the Findings of Fact have set forth in some detail the history of the litigation concerning the desegregation of the Durham County and City school systems and the demographic changes that have resulted in the current population characteristics of these areas. The Court has adopted verbatim portions of the proposed findings submitted by counsel where such were found relevant to the issues and accurate as the Court viewed the facts. In short, the population of the City of Durham and the Durham City Administrative School Unit are becoming blacker, such that at present the student population of the Durham City schools is over 70 percent black (reflecting an increase of approximately 8 percent in three years). Somewhat surprisingly, the Durham County Administrative School Unit is also becoming blacker, the percentge of black school children in the County unit now at 25 percent, an increase of approximately 6 percent in three years. Both blacks and whites are leaving the City schools (since 1970, the City has lost close to 3,000 students of which approximately two-thirds are white) and attending County public schools or private schools. Of the approximately 2,000 students the County has gained since 1970, a majority have been black. There is evidence that approximately 1,500 students have actually transferred from the City to the County system during this period. Of this number, over two-thirds are black. The remaining decline of 1,500 students from the City system must result from population decline and transfers to private schools. Apparently the "white flight" is more to private schools whereas the "black flight" is to the County public schools. To reverse this trend, to provide a better balance for the racial mixture of schools, and to provide a more stable desegregation situation, the plaintiffs now seek an order effecting a merger of the two school systems, or alternatively an order requiring a student assignment plan which will accomplish the same result.

There is much evidence in this case which speaks strongly in favor of a merged school system. The geographic entity which would be involved is not unduly large. The combined facilities of

the County and the City could be more efficiently utilized and overcrowded conditions relieved through use of underutilized facilities in the City unit. Adequate financial resources would be available to correct any residual deficiencies. The racial composition of the combined student body would permit a beneficial composition of racial mixtures within the individual schools which would help to promote a stabilized, desegregated school system (in a merger situation, the student enrollment would exceed 25,000 of which approximately 50 percent would be white). However, it must be emphasized that it is not the wisdom, or lack of wisdom, of maintaining separate school systems which is before this Court; it is the constitutionality of maintaining separate systems that is in issue. Courts are properly admonished to forego any temptation to embroil themselves in issues not of a justiciable nature.

The starting point of the inquiry which must be undertaken is set forth in Bradley v. School Board of City of Richmond, Virginia, 462 F.2d 1058 (4th Cir. 1972). In *Bradley,* the issue before the court was whether or not a federal court could "compel one of the States of the Union to restructure its internal government for the purpose of achieving racial balance in the assignment of pupils to the public schools?" Bradley v. School Board of City of Richmond, Virginia, *supra* at 1060. The answer to this question, appearing in the very next sentence and thoroughly explained in the balance of the opinion, is, "We think not, absent invidious discrimination in the establishment or maintenance of local government units." Bradley v. School Board of City of Richmond, Virginia, *supra.*

*Bradley* is difficult to distinguish from the case at bar. In *Bradley,* as in this case, there existed separate school systems (the Richmond City Unit and two adjoining county units) among which there was an "unfortunate racial balance." A joinder of the three school systems would result in a majority white school system notwithstanding the heavy concentration of blacks within the city unit. This is true of the Durham units. Significantly, the two crucial features of *Bradley* also are present in the case at bar. First, the Richmond School Unit had "done all it [could] to disestablish . . . the formerly state-imposed dual school system . . .," and the county school districts were also found to be "unitary." Bradley v. School Board of City of Richmond, Virginia, *supra* at 1061. In the case at bar, both the Durham County and the City units have been operating under court-approved desegregation plans, and both have voluntarily submitted to the Court revisions to their plans whereby further desegregation, within each school unit, can be achieved. Durham County is already proceeding with its plan (it is now before the Court in the form of a motion), and the City has indicated a willingness to implement court-approved revisions when the uncertainty caused by the pendency of this lawsuit is removed. Much has been done by these units to meet the mandates of Green v. School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968) and Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S. Ct. 29, 24 L.Ed.2d 19 (1969), and both school units have demonstrated a concern to eliminate even the appearance of a return to a segregated system.

The second factor present in *Bradley* and crucial to its result was the finding that the school boundary lines were not maintained, either in the past or in the present, for the purpose of perpetuating racial discrimination in the schools. Bradley v. School Board of City of Richmond, Virginia, *supra,* 462 F.2d at 1064. The court in *Bradley* found not a "scintilla of evidence" that the boundaries were used for this purpose. At least with respect to the Durham City and County geographic boundaries (more will be said on what effect, if any, the growth of the "city-out" area has on this conclusion), there has been no showing, whatever, that they have ever been used to establish or perpetuate a

dual school system. When these boundary lines were established, dual school systems existed within each of these governmental units, negating any need to use these lines for this purpose. There has never been state imposed segregation as between the Durham City and the Durham County school systems. See Bradley v. School Board of City of Richmond, Virginia, *supra* at 1065. The racially neutral effect of these geographic boundaries is underscored by the significant number of black students who have left the City school system to attend County schools (since 1970 more blacks have entered the County school system than whites). If school officials are attempting to use the boundary lines in order to contain the black students within the City-proper, they have failed. The City school system is majority black and becoming blacker; the County school system is majority white and becoming blacker.

The disparity in racial composition between the Durham County and City pupil populations results not from state-imposed segregation, but from a variety of complex and interrelated social factors which defy tidy cause and effect analysis. The same population shifts which have resulted in the concentration of blacks in the core-city area of Durham and whites in the surrounding County are underway in other areas throughout North Carolina and the nation. *The Raleigh Times,* June 19, 1974, at 1A; *Greensboro Daily News,* June 23, 1974, at D1. A rising black middle class and a corresponding move to the suburbs by black families may well start to reverse this trend and to alleviate racial tensions which are associated with the present living patterns. See *Time Magazine,* June 17, 1974, at 19. A widening gulf between the rich and poor, as contrasted with the concentrations of whites and blacks, may present greater challenges to educational systems in years to come, than does the present tendency toward majority-black city school systems. These challenges must not be left to the inadequate power of courts to devise solutions. The answers must come from a concerned citizenry and from enlightened educators, and must be put into practice after a full airing through political processes.

The racial disparity between the Durham City and County school units results from de facto segregation, a distinction still viable in equal protection analysis and crucial to a court's jurisdiction. Spencer v. Kugler, 326 F. Supp. 1235 (D.C.N.J.1971), aff'd mem. 404 U.S. 1027, 92 S.Ct. 707, 30 L.Ed.2d 723 (1972). But see Keyes v. School District No. 1, Denver, Colo., 413 U.S. 189, 214 (Douglas dissenting), 216 (Powell dissenting), 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). This alone is sufficient to compel this Court to deny to plaintiffs the requested relief. However, relief should also be denied where the clear purpose of the action is to accomplish a "stable racial mix" rather than to overcome the vestiges of a dual school system. Mapp v. Board of Education of City of Chattanooga, Tenn., 366 F.Supp. 1257, 1259 (E.D.Tenn. 1973). In *Mapp,* a case similar in many respects to the case at bar, Judge Wilson stated that "[t]he 'mixing' of races is not the constitutional mandate. The constitutional mandate is the equal protection of the law." Mapp v. Board of Education of City of Chattanooga, Tenn., *supra* at 1259. See also Bradley v. Board of City of Richmond, Virginia, *supra* 462 F.2d at 1064; Goss v. Board of Education, City of Knoxville, Tenn., 340 F.Supp. 711 (E.D.Tenn.1972). The U. S. Supreme Court in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), while defining broad remedial powers available to courts to overcome racially discriminatory school systems, recognized that a "unitary" school system does not require each school to have a prescribed ratio of black students to white students. As stated by Chief Justice Burger,

"At some point, these school authorities and others like them should have achieved full compliance with this

Court's decision in Brown I. The systems would then be 'unitary' in the sense required by our decisions in Green and Alexander.

"It does not follow that the communities served by such systems will remain demographically stable, for in a growing, mobile society, few will do so. Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system . . . . in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary." Swann v. Charlotte Mecklenburg Board of Education, *supra* at 31–32, 91 S.Ct. at 1284. *A fortiori,* where there has been no state imposed segregation as between separate school systems, racial mixing of those school systems should not be required.

As in *Bradley,* a court-ordered merger of the Durham County and City schools would present practical problems which, although not insoluble, are better solved through the political processes. Although a vote of the affected citizens in a merger situation is not required for the merger to occur, such elections are permitted by statute and were used on two occasions when resolutions for consolidation or merger of the two school systems were passed by the City and County Boards of Education. Both resolutions were rejected by the voters, the most recent vote occurring in 1971. For the Court to order a merger of these systems after the merger proposals were defeated by the affected citizens would invite public dissatisfaction with the entire school system and a corresponding loss of needed public support.

The differential in the local supplement taxes and other financial considerations also present administrative problems. Although it appears that the Board of County Commissioners is authorized by statute to raise needed funds for the operation of the schools, the County electorate has shown a disinclination to impose an additional tax burden on itself by raising the County supplemental tax. A court-ordered merger could force the County Commissioners to levy additional taxes to support an unwanted school system. These and other practical difficulties attendant to a forced merger (the practical problems of the proposed student assignment plan would be even greater) are not sufficient to deny the granting of relief if such relief is warranted under the Constitution. However, as previously stated, the record is devoid of evidence that the present school unit boundaries operate to deny attendance at a particular school on the basis of race.

It is important to note that this is not a case in which there has been an attempt to redraw school lines in order to avoid the effects of desegregation orders. This practice has been uniformly condemned. Wright v. Council of City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1971); United States v. Scotland Neck Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1971); Turner v. Littleton-Lake Gaston School District, 442 F.2d 584 (4th Cir. 1971). In these cases, some positive act by state officials had as its effect the hindering of the desegregation of formerly dual school systems. This critical distinction from the case at bar is at the core of this lawsuit and deprives this Court of jurisdiction to grant the relief sought.

Chief Justice Burger, in his dissenting opinion in *Wright,* wrote at length on the caution a court should exercise before ordering political entities of a state to disregard their separate existence. Significantly, the Chief Justice stated without qualification that,

"[j]udicial power ends when a dual school system has ceased to exist." Wright v. City of Emporia, *supra,* 407 U.S. at 479, 92 S.Ct. at 2211. Chief Justice Burger further stated that, "[a]lthough the rights and powers of a bona fide political entity may not be used as a cloak for evasive action," that "the discretion of a district court is further limited where, as here, it deals with totally separate political entities." Wright v. Council of City of Emporia, *supra* at 478–479, 92 S.Ct. at 2211. The evidence in this case convincingly establishes that the Durham County and City school boundaries were never intended as a device to segregate schools, nor to hinder desegregation efforts. The desegregation of a dual school system is the court's business; the responsibility for quality education must rest with the people.

Mention should also be made of Bradley v. Milliken, 484 F.2d 215 (6th Cir. 1973), the "Detroit School Case," now pending before the U. S. Supreme Court. In Bradley v. *Milliken,* the district court found that officials at both the state and local levels had acted to establish a segregated public school system in the City of Detroit. The court further found that de jure segregation could not be remedied by a metropolitan-only plan of desegregation. The court held that school district boundaries are not absolute barriers to plans of desegregation and distinguished Bradley v. School Board of the City of Richmond on its facts. It is doubtful that a U. S. Supreme Court decision in Bradley v. Milliken, though helpful, would dictate the result in the case at bar. A crucial factual distinction exists in that both the Durham County and the Durham City school systems have fully complied with a court-approved plan of desegregation. Moreover, all parties to this lawsuit are in need of a prompt decision. Bradley v. School Board of the City of Richmond is the controlling law in this circuit, and it is concluded that under *Bradley,* as applied to the facts of this case, both the requested merger and the county-city student assignment plan must be denied.

■ The plaintiffs, as alternative relief, seek to have the City limits and the boundaries of the City Administrative School Unit made coterminous. In recent years, certain areas annexed by the City of Durham have not become part of the City school system. Prior to the May, 1974, annexation, approximately 4,657 students resided in this "city-out" area, of which over 40 percent were black. Again, there is simply no showing that the purpose or effect of this practice was to perpetuate a dual school system. Had these students attended the City schools, the black majority would have been reduced from 70 percent to 60 percent. Conversely, because these students attended County schools the percentage of blacks in the County school system was significantly increased. Whether there has been a resegregation of the schools would appear to depend on which school system is scrutinized.

What the plaintiffs ask, in effect, is to hold that anytime the City annexes land and the student population of the annexed area is such that their attendance in the City schools would lower the black percentage, then the annexed area must also become part of the City school system. Such intermingling with the internal affairs of political subdivisions of the State would be inconsistent with fundamental principles of federalism and would contravene the Tenth Amendment to the United States Constitution. Bradley v. School Board of City of Richmond, Virginia, *supra.* Moreover, this Court will not entertain the unwarranted assumption that a predominantly black school system is doomed to inferiority. There has been no satisfactory showing that the act of annexation by the City is intended to resegregate the schools. The conclusion, if any can be drawn is to the contrary. In annexing predominantly white areas, the city presumably increases its tax base and pro-

vides to the citizens of the affected area the opportunity to attend the City school system. It is the conscious choice of the people residing in the annexed areas to remain in the County schools, not the act of the City officials. The motivations for this decision are as complex as they are varied. Certainly racial considerations are present, but to attribute this decision solely to this ground is to belie the mammoth movement of middle class Americans, black and white, from core-city areas to surrounding suburbs. Perhaps through constructive programs instituted at all levels of government, this trend can be reversed. The plight of cities is one of the pressing problems confronting society today. However, the narrow issue to be decided in this case is whether or not the annexation process, as practiced by the City of Durham, perpetuates a dual school system. It does not. The present "city-in" area is essentially unchanged from that area which has been operating the City school system in compliance with the court-approved plan of desegregation. It would be ironic to now hold that the City, in annexing nearby areas, is acting unconstitutionally by not compelling the students in those areas to attend City schools. The City would unquestionably welcome these areas into the school system but clearly this decision should be left to the people themselves. If this presented a "freedom-of-choice" plan as a method of desegregating a dual school system, it could not stand constitutional muster. Green v. School Board of New Kent County, *supra*. It is a "freedom-of-choice" plan, however, with the choice being between two unitary school systems. Accordingly, the requested relief of ordering the City school boundaries to be coterminous with the City corporate limits must be denied.

Finally, attention must be briefly focused on each school system, separately. There is no question that the location of certain low-income housing projects and other factors have created a disproportionate number of blacks in some of the County schools, notably in Bragtown and

Lakeview. The County Board of Education has recognized this problem and has presented to the Court a pupil assignment plan which eliminates the racial imbalances. This plan, which is to become effective in the 1974–75 school year, is approved unless objections are filed within ten days of the date of this Memorandum. The Board's early recognition of this developing problem and its prompt initiatives to arrive at a solution is commendable.

The City of Durham has also acted in compliance with the court-approved desegregation plan. However, several schools in the City unit are now over 90 percent black. This does not, per se, constitute a constitutional violation.

"School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities; absent a finding of a constitutional violation, however, that would not be within the authority of a federal court." Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 402 U.S. at 16, 91 S.Ct. at 1276.

However, the increasing racial imbalance in some schools in the Durham City Unit suggests the need for some revision. The City Board of Education has foreseen this situation and has thoroughly studied alternative pupil assignment plans. These studies have resulted in proposals which, if updated and implemented, will effect substantial progress in the further desegregation of the Durham City schools.

There is evidence that many whites will continue in the City school system so long as they can be sure that there will be other white children in the same classes. The answer is in encouraging

people to stay in the City schools, not in preventing them from leaving through busing plans or a forced merger with the surrounding County. This burden must fall on the City system, and a thoughtful plan of school attendance will do much to attain this goal. Accordingly, the Durham City Board of Education is directed to submit its attendance plan for the 1974–75 school year within ten days of the date of this Memorandum for Court consideration. It is expected that with a good faith effort on behalf of all concerned, an approved plan can be operational in the City schools in the forthcoming school year.

## CONCLUSIONS OF LAW

1. The "Permanent Plan for Desegregation of the Durham City Schools" filed herein on June 26, 1970, as modified and approved by this Court on July 31, 1970, was implemented by the Durham City Board of Education with the beginning of the 1970–71 school year, and the Board has operated its system in full compliance with the order of this Court since July 31, 1970.

2. All invidious racial distinctions have been eliminated in the Durham City Administrative School Unit, and in particular with respect to such matters as transportation, supporting personnel, extracurricular activities, maintenance of buildings and distribution of equipment, as required in Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 18, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).

3. Paragraph 12 of the plan for the Durham City Administrative School Unit, approved on July 31, 1970, provides for faculty assignment in each school with a ratio of white to Negro faculty members substantially the same throughout the system, and this provision has been implemented each school year since 1970–71, in accordance with the decision of the United States Supreme Court in Swann v. Charlotte-Mecklenburg Board of Education, *supra* at 19, 91 S.Ct. 1267.

4. School construction and abandonment have not been used in the Durham City Administrative School Unit to perpetuate or re-establish a dual school system; and the order of July 31, 1970, adopting the present plan retains jurisdiction to assure that such practices will not be possible in the future, in compliance with Swann v. Charlotte-Mecklenburg Board of Education, *supra* at 21, 91 S.Ct. 1267.

5. As stated in the *Swann* decision, "[t]he record in this case reveals the familiar phenomenon that in metropolitan areas minority groups are often found concentrated in one part of the city. In some circumstances certain schools may remain all or largely of one race until new schools can be provided or neighborhood patterns change." Swann v. Charlotte-Mecklenburg Board of Education, *supra* at 25, 91 S.Ct. at 1280. After close scrutiny of the assignment process in the Durham City Administrative School Unit, it is concluded that the existence of the small number of schools predominantly of one race in the system is not the result of state-enforced segregation.

6. The present plan approved by this Court on July 31, 1970, employs gerrymandering of attendance zones and pairing of schools at opposite ends of the City, and constitutes sufficient remedial corrective measures to accomplish the transfer of Negro students out of formerly segregated Negro schools and transfer of white students to formerly all-Negro schools, in compliance with the guidelines referred to in the *Swann* decision. Swann v. Charlotte-Mecklenburg Board of Education, *supra* at 27, 28, 91 S.Ct. 1267.

7. The busing remedy, approved in *Swann, supra,* has been utilized in the Durham City Administrative School Unit, and further court-ordered pairing or grouping of attendance zones is not constitutionally mandated at this time.

8. With the implementation of this Court's order dated July 31, 1970, adopting the desegregation plan presently em-

ployed in the Durham City Administrative School Unit, the Board achieved full compliance with the decision of the United States Supreme Court in *Brown I*, and the Durham City school system is now "unitary" in the sense required in the later decisions in Green v. School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969); and Swann v. Charlotte-Mecklenburg Board of Education, *supra.*

9. The desegregation plan for the Durham County Administrative School Unit, approved by this Court on December 11, 1969, and subsequently by the Fourth Circuit Court of Appeals, was implemented in the Durham County schools in January, 1970, and, except as amended from time to time with the consent of counsel for the plaintiffs and with the approval of this Court in order to alleviate overcrowding in some of the schools, has remained in continuous effect since that time.

10. All invidious racial distinctions have been eliminated in the Durham County Administrative School Unit, and in particular with respect to such matters as transportation, supporting personnel, extracurricular activities, maintenance of buildings and distribution of equipment, as required in Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 402 U.S. at 18, 91 S.Ct. 1267.

11. Paragraph 6 of the plan for the Durham County Administrative School Unit, approved on December 11, 1969, provides for faculty assignment in each school with a ratio of white to Negro faculty members substantially the same throughout the system, and this provision has been implemented each school year since January, 1970, in accordance with the decision of the United States Supreme Court in Swann v. Charlotte-Mecklenburg Board of Education, *supra* at 19, 91 S.Ct. 1267.

12. School construction and abandonment have not been used in the Durham County Administrative School Unit to perpetuate or re-establish a dual school system, and the order of December 11, 1969, and all subsequent amendments, retains jurisdiction to assure that such practices will not be possible in the future, in compliance with Swann v. Charlotte-Mecklenburg Board of Education, *supra* at 21, 91 S.Ct. 1267.

13. The busing remedy, as well as other measures, prescribed in *Swann, supra,* has been utilized in the Durham County Administrative School Unit and court-ordered procedures to further desegregate the school system or perpetuate the unitary character of the system are not constitutionally mandated at this time.

14. With the implementation of this Court's order dated December 11, 1969, adopting the desegregation plan presently employed in the Durham County Administrative School Unit, the Board achieved full compliance with the decision of the United States Supreme Court in *Brown I*, and the Durham County school system is now "unitary" in the sense required in the later decision in Green v. School Board of New Kent County, *supra*; Alexander v. Holmes County Board of Education, *supra*; and Swann v. Charlotte-Mecklenburg Board of Education, *supra.*

15. The Durham City Administrative School Unit and the Durham County Administrative School Unit were established and have been continuously operated as separate, independent and autonomous local agencies of the State of North Carolina charged with the operation of public schools within their boundaries. Bridges v. Charlotte, 221 N.C. 472, 480, 20 S.E.2d 825 (1924); Frazier v. Commissioner, 194 N.C. 49, 62, 138 S.E. 433, 430 (1927).

16. There has been no interaction between the defendant Boards of Education, or among any of the parties defendant, for the purpose of impeding de-

segregation in either school system or to keep the County system majority white and the City system majority black by confining blacks to the City system.

17. By the Tenth Amendment to the Constitution of the United States it is provided that: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." One of the powers thus reserved is the power to structure municipal corporations, political subdivisions and administrative agencies to exercise these powers. The number, nature and duration of the authority conferred upon these corporations and agencies and the territory over which they shall exercise such authority vests in the absolute discretion of the state. Hunter v. Pittsburg, 207 U.S. 161, 178, 28 S.Ct. 40, 46, 52 L.Ed. 151 (1907). "When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review." Gomillion v. Lightfoot, 364 U.S. 339, 347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960). If the states' near plenary power over its political subdivisions and agencies is used as an instrument to deny to blacks their Fourteenth Amendment right to attend a unitary school system, then the Tenth Amendment must yield. *Gomillion, supra*; Bradley v. School Board of City of Richmond, 462 F.2d 1058 (4th Cir. 1972).

18. The facts of this case do not establish that the establishment or maintenance of the boundaries of the Durham City Administrative School Unit or the Durham County Administrative School Unit has circumvented or impaired any federally protected right of the plaintiffs or of the class they represent. The fact that the Durham City Administrative School Unit is not coterminous with the boundaries of the City of Durham has not resulted from action or purpose on the part of the defendants, singularly or in concert, to circumvent or impede the process of desegregation in the two school systems. "In the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect the racial composition of the schools, further intervention by a district court should not be necessary." Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 402 U.S. at 32, 91 S.Ct. at 1284; Bradley v. School Board of City of Richmond, *supra*.

19. Because the Court is unable to discern any constitutional violation in the establishment and maintenance of these two school districts, nor any unconstitutional consequence of such maintenance, it is not within the authority of the Court to order the merger or consolidation, in whole or part, of the two school units nor to order that pupils be assigned between the two systems without regard to the school unit boundaries duly established under the laws of the State of North Carolina. Bradley v. School Board of City of Richmond, *supra*.

20. The affirmative duty of the defendants, Durham City Board of Education and Durham County Board of Education, to disestablish the formerly dual system of schools in their respective administrative units has been accomplished. This is the extent, under current law, of their affirmative constitutional obligations. Neither school authorities nor this Court are constitutionally required to make year-by-year adjustments in the racial composition of student bodies because of demographic changes in the communities served by the school systems. Swann v. Charlotte-Mecklenburg Board of Education, *supra*, 402 U.S. at 31–32, 91 S.Ct. 1267.

21. The Durham City Board of Education and the Durham County Board of Education may at any time submit to this Court for consideration such changes in their Court-approved plans as they, or either of them, may deem appropriate for the development of a more effective educational program and the

achievement of a more stable level of racial integration. Any such proposals should be served upon counsel for the plaintiffs simultaneously with their being filed with the Court.*

---

* The Court understands, from the news media, that the Supreme Court of the United States has now rendered a decision in Bradley v. Milliken, *supra*, the "Detroit School Case." The decision in the subject case was written prior to the decision by the Supreme Court in Bradley v. Milliken, and the entry of this decision will not be delayed for study of *Milliken*. However, it is believed that *Milliken* reinforces the decision in this case.